ARTHUR PRATT, APPELLANT, *v.* GEORGE SWAN, RESPONDENT.

1. *Statutory Construction—Chief of Police—Tenure of Office.*
Under chapter 37, Sess. Laws 1894, p. 33, as re-enacted and amended by chapter 73, Sess. Laws 1896, p. 219, the chief of police of Salt Lake City was entitled to hold his office during good behavior, which meant for life, unless it would be otherwise provided by statute, or unless he became guilty of such improper conduct as justified a removal, and the office of chief of police in cities of the first class was not abolished by the Revised Statutes of 1898.

2. *Same.*
Under section 2482, Rev. St. 1898, the chief of police was continued in office, and is entitled to hold the same as therein provided.

3. *Same—Statutes—Repeal—Intent of Legislature.*
The general rule that an unqualified repeal of a statute creating an office abolishes the office and removes the incumbent is well established; but where the repealing statute was enacted, not for the purpose of abrogating all the laws, but merely for the purpose of effecting a revision and codification of the laws, the repealing statute must be construed in the light of the circumstances which surrounded its enactment, and effect must be given to the intent of the legislature, even though the repeal appears to be, in terms, express. In such case the repealing statute will be considered as but a subordinate feature of the general plan of revision, and the old statutes, in practical

operation and effect, must be regarded in construing the Revised Statutes and acts of amendment and repeal, as continued and modified, rather than as abrogated and new ones enacted, although in terms all were repealed. The intent of the legislature must prevail, even though opposed to the literal sense of the terms, and control the strict letter of the repealing statute.

4 *Municipal Officers.*

In the absence of any restricting provision of statute, municipal officers hold over until their successors are elected and qualified.

5. *Statutory Construction—Suspension from Office.*

Under section 11 of the act of 1896, the board of police and fire commissioners had the power to suspend the chief of police upon charges having been preferred against him. But in any case where the suspension was to be without pay, or a removal from office was to follow, the board was bound to proceed conformably to section 17 of the same act, and at once afford the suspended officer an opportunity to be heard in his own defense, and, if the board failed to provide for a hearing, the suspended officer did not forfeit his salary by reason of the suspension.

(Decided March 24, 1898.)

Appeal from the Third district court, Salt Lake county. A. N. Cherry, *Judge.*

Application by Arthur Pratt for a writ of mandate against George Swan, city auditor of Salt Lake City. A demurrer to the petition was sustained, and the petition dismissed. Plaintiff appeals. *Reversed.*

This was an application for a writ of mandate against the respondent, auditor of public accounts of Salt Lake City, to compel him to issue his warrant in favor of the relator, on the city treasurer, for a certain sum of money, which, the relator claims, is due him for salary as chief of police of the city. It is stated in the petition, substan-

tially, that on December 31, 1894, pursuant to chapter 37, Sess. Laws 1894, the petitioner was duly appointed to the office of chief of police of Salt Lake City, by the board of police and fire commissioners, and thereupon qualified and entered upon the discharge of the duties of the office, and ever since has been such chief of police; that on June 14, 1897, the supreme court of the state of Utah, in a certain proceeding therein had, wherein the petitioner was plaintiff and said board defendant, determined that the petitioner was the chief of police of said city, and entitled to hold the office and enjoy the emoluments thereof during good behavior, unless it should be otherwise provided by law; that his salary was fixed by ordinance of the city council at $150 per month, payable at the end of each month; that the defendant is the city auditor, but since August 31, 1897, has failed and neglected to pay the petitioner his salary; that upon demand made, on February 11, 1898, the fendant refused to issue his warrant on the city treasurer for $750, which is the amount due and owing the petitioner as salary from August 31, 1897, to February 1, 1898, and still refuses to issue the warrant; that on July 14, 1897, pretended charges were filed against the petitioner before the said board, and thereupon the board suspended him from performing the duties of his office, although he was at all times ready and willing to perform the same; and that the charges were never tried, and the petitioner was never removed from his office. The petition contains further allegations to the effect that the Revised Statutes, which took effect January 1, 1898, repealed the law which created the board of commissioners, and under which the petitioner was appointed, but that by the revision the office of chief of police was not abolished, and that he is still entitled to hold it under the same tenure and discharge the duties thereof; that after

the board had ceased to exist by operation of law, and
after the proceeding relating to its suspension had become
null and void, the petitioner, at divers times, demanded of
the mayor of the city to be allowed to perform the active
duties of the office; that each time the mayor declined to
do so; and that at all times the petitioner was willing to
perform such duties.   The defendant interposed a de-
murrer to the petition, on the grounds that it did not state
facts sufficient to constitute a cause of action, and that
there was a defect of parties.   The demurrer was sus-
tained, and, the petitioner, refusing to amend, the petition
was dismissed.   The appeal is from the judgment.

*Powers, Straup & Lippman,* for appellant.

*W. C. Hall, D. B. Hempstead,* and *Brown & Henderson,*
for respondent.

No briefs were filed.

BARTCH, J., after a statement of the case as above, de-
livered the opinion of the court:

The most important question to be determined is
whether the office of chief of police is abolished by the
Revised Statutes of 1898. Counsel for the appellant main-
tain that there was no intention on the part of the legisla-
ture, in enacting these statutes, to abolish the office; that
the same is still in existence; and that the appellant, hav-
ing been appointed thereto under a tenure during good be-
havior, is still entitled to hold the same, and receive the
emoluments thereof.   The respondent contends that the
law which created the office was repealed, and the office
thereby abrogated; that the abrogation of the office
effected a removal of the appellant; and that, therefore, he
is not entitled to continue to exercise the duties of the
office, or receive the emoluments thereof.   The determina-

tion of the question, thus presented, requires a consideration of the laws under which the office was created, and the several provisions of the Revised Statutes, including the repealing act, which have a bearing on the case. The question necessarily involves, not only the office of the chief of police, but also the offices of the entire police force in the cities affected by the statute laws on this subject. These offices, as constituted at the time of the revision of the laws, were created by the act of 1894 (chapter 37, p. 33, Sess. Laws), entitled "An act to appoint a board of police and fire commissioners in certain cities, and to place the police and fire departments of said cities upon a nonpartisan basis," section 4 of which provides: "The police departments of cities of 12,000 or more inhabitants, of the territory, shall consist of the board hereby created, a chief and a captain of police, and such other officers and men as the city councils of said cities shall direct." The "board" herein mentioned is the board of police and fire commissioners, and was provided for in section 1. Section 7, so far as material here, reads: "The chief of police, and chief engineer of the police and fire departments, shall be appointed by the board of commissioners hereby created,and retain their positions during good behavior, except in the cases herein otherwise provided." While this act was repealed by chapter 72, p. 219, Sess. Laws 1896, its provisions, and especially those above quoted, were substantially re-enacted; and in *Pratt* v. *Board*, 15 Utah 1, this court, after a review of the statutory provisions respecting the tenure of office, held that as the appellant therein, who is also the appellant herein, had been duly appointed to the office of chief of police, he was entitled to hold the same during good behavior, which meant for life, unless it should be otherwise provided by statute, or unless he became guilty of such improper conduct as would justify a removal.

It is not contended that the officer was removed for misbehavior or improper conduct, for, although it is admitted that at one time charges were preferred against him, it is also admitted that no hearing was ever had and that no removal was ever effected by reason of such charges; but the respondent insists that the laws, by virtue of which the office was created and the appellant appointed, were repealed and superseded by the provisions of the Revised Statutes, and that the office was not continued, but abolished, and the appellant in that manner removed. This brings us to a consideration of the provisions of the Revised Statutes applicable to this case, to determine their effect upon those of the act of 1894, as re-enacted in 1896, which are material here.

Section 2479 of the revision provides that the Revised Statutes shall take effect on the 1st day of January, 1898. In section 2480 all prior laws of Utah, not excepted, are repealed. Section 2482 provides as follows: "All persons who, at the time said repeal shall take effect, shall hold any office under the statutes hereby repealed, shall continue to hold the same under the tenure thereof, except those offices which are abolished, and those as to which a different provision is made by the Revised Statutes." This section is, in its terms, general, and applies to all public officers of the state, including the chief of police and other policemen in cities, who, at the time the repeal took effect, held office under the old statutes, except those who held offices which were abolished, or for which a different provision was made. In looking over the Revised Statutes, we are unable to find any different provision respecting the office of chief of police, or such as could be considered in lieu of those concerning the office contained in the re-enactment of 1896. Nor have we been cited to any such different provision. The same

may be said of policemen generally of the cities of the class to which Salt Lake City belongs.

The vital question, under section 2482, therefore is, was the office abolished? If so, its abrogation must have been accomplished by the general repealing provision contained in section 2480, for nowhere do we find, nor have we been cited to, any special or express provision in the revision repealing the act of 1896. No direct reference thereto, of appeal, anywhere appears. No doubt, it is well established, as a general rule, that an unqualified repeal of a statute creating an office abolishes the office and removes the incumbent; but where, as in this case, the repealing statute was enacted, not for the purpose of abrogating all the laws, but merely for the purpose of effecting a revision and codification of the laws, the repealing statutes must be construed in the light of the circumstances which surrounded its enactment, and effect must be given to the intent of the legislature, even though the repeal appears to be, in terms, express. In the general plan of revision, there was no design to absolutely repeal all the statutes of the state. Nor will a court assume, because of the repealing clause, that in such plan there was an intention to abolish offices necessary to the public good or to remove the incumbent thereof. The evident design in the plan of revision was to continue in force the great body of the statutes, with some modifications and amendments, as well as to continue in existence the officers necessary in the execution of the laws, under the Revised Statutes. The object, doubtless, was not to abrogate or change the law to any great extent, or to abolish offices or remove incumbents, but to reconcile contradictory enactments and discrepancies, to remove doubts, and weed out superfluous matter, to give the sanction of positive law to rules which had previously been

promulgated and stood alone on the authority of usage, deduction, and judicial decision, and to render all enactments of statute law more concise, clear, accurate, and practical. To prevent rejected and superfluous matter in the old laws from having the force of law in the new, and to prevent effect and operation of old laws for which a different provision was made in the new, the repealing statute was enacted, and was thus but a subordinate feature of the general plan. The correctness of these observations will become more evident when we consider that, simultaneously with the repeal, the great mass of the laws were re-enacted. Not an instant of time elapsed between the repeal and re-enactment. The repeal must therefore be regarded as merely a part of the means of revision,—as but a necessary formality to substitute the Revised Statutes for the statutes as they were before the revision. The old statutes, in practical operation and effect, must be regarded by the courts, in construing the Revised Statutes and acts of amendment and repeal, as continued and modified, rather than as aborgated and new ones enacted, although, in terms, all were repealed. The intent of the legislature must prevail, even though opposed to the literal sense of the terms, and control the strict letter of the repealing statute; and where a particular construction, which appears to be included within the terms, would lead to absurd consequences, the court will, out of respect to the legislature, adopt some other construction which will avoid such consequences, if from the whole purview it may fairly be done. The legislature can never be presumed to have intended an absurd thing. "Where a law is plain and unambiguous, whether it be expressed in general or limited terms, the legislature should be intended to mean what they have plainly expressed, and, consequently, no room is left for construction. But if,

from a view of the whole law, or from other laws in *pari materia*, the evident intention is different from the literal import of the terms employed to express it in a particular part of the law, that intention should prevail, for that in fact is the will of the legislature." *U. S.* v. *Fisher*, 2 Cranch 538, 399. In *Wright* v. *Oakley*, 5 Metc. (Mass.) 400, Mr. Chief Justice Shaw said: "In construing the Revised Statutes and the connected acts of amendment and repeal, it is necessary to observe great caution, to avoid giving an effect to these acts which was never contemplated by the legislature. In terms, the whole body of the statute law was repealed; but these repeals went into operation simultaneously with the Revised Statutes, which were substituted for them, and were intended to replace them, with such modifications as were intended to be made by that revision. There was no moment in which the repealing act stood in force without being replaced by the corresponding provisions of the Revised Statutes. In practical operation and effect, therefore, they are rather to be considered as a continuance and modification of old laws, than as an abrogation of those old and the re-enactment of new ones. In order to construe them correctly, we must take the whole of the Revised Statutes, together with the act of amendment and the repealing act, and consider them in reference to the known purposes which the legislature had in view in making the revision." 1 Kent, Comm. 461, 462; Suth. St. Const. § 134; *Middleton* v. *Railroad Co.*, 26 N. J. Eq. 270; *Ex parte Ellis*, 11 Cal. 223; *Knowles* v. *Yates*, 31 Cal. 83; *Steamship Co.* v. *Joliffe*, 2 Wall. 450; *Glentz* v. *State*, 33 Wis. 549; *Smith* v. *People*, 47 N. Y. 339; *King* v. *Rogers*, 10 East 569; *Warren* v. *Windle*, 3 East 205.

In the light of these principles, then, and by their application to the case before us, we must proceed to deter-

mine, by further reference to the act of 1896, the Revised Statutes, and the act of repeal, whether the legislature intended to abolish the office of chief of police. The act of 1896, as we have seen, was a re-enactment and amendment of the act of 1894, and under these acts were created a fire department and police department in cities of 12,000 or more inhabitants. The chief of police was the executive officer of the police department. His office was thus created by statute, and was in existence at the time of the revision of the laws, and upon his appointment he was entitled to hold the office during good behavior, unless thereafter it was otherwise provided by law. Under the same acts other police officers were appointed, and they, together with the chief of police, constituted the police force peace officers in cities of the class designated in the statute. In the Revised Statutes (chapter 4, § 206, subd. 59) we find that, by express provision, the city council has been given power "to provide for the organization and support of a fire department," and to prescribe the necessary regulations therefor. But nowhere in chapter 4, nor anywhere else in the revision, have we been able to find nor have we been cited to any provision respecting a police department in cities of the first class,—the class to which Salt Lake City belongs. Although there has been found no provision creating a police department in the large cities, there is contained in chapter 6, § 213, Rev. St., a provision for the election, in all cities of less than 12,000 inhabitants, of a city marshal; and in section 248, respecting the duties of the marshal in his character as chief of police, it is provided as follows: "In cities of less than twelve thousand inhabitants, the marshal shall be *ex officio* chief of police and shall perform the duties and exercise the authority thereof. He shall, under the direction of the council, direct and control the police of the

city, and whenever the interests of the city demand, by and with the consent of the mayor, appoint such number of special policemen as may be required, and perform such other duties as may be prescribed by ordinance." This section prescribes the duties of the chief of police with some care, and it shows that the legislature attached considerable importance to that office, even in the small cities, and also what the trend of legislative thought on the subject of police protection was. While, however, there appears to be no express provision in the Revised Statutes to create a police department in the large cities, or for the appointment of a chief of police, still, in section 245, the powers and duties of the chief of police are defined and prescribed with much precision, and in section 246 the powers and duties of other police officers are likewise defined and prescribed.

Thus it will be seen that in the Revised Statutes there is ample provision to create and maintain a fire department in the large cities, to create and maintain a police force in the small cities, and, according to respondent's theory, provisions defining the powers and prescribing the duties of the chief of police and other public officers in large cities, with their offices abrogated. Is it not clear that such a contention leads to an absurdity? Would the able counsel who argued this case seriously undertake to maintain that the legislature intended to protect the peace and good order of small communities, to guard against the ravages of fire in large cities, and, at the same time, to ignore the peace and welfare, the lives and property, of the populous cities, leaving them to the evil propensities of the criminal classes who are wont to infest such cities? No such design can or will be imputed to a co-ordinate branch of the government. Nor are there any circumstances in this case which would warrant such

imputation. Again, why define the powers and prescribe the duties of an officer whose office has been abolished? Counsel say because the city council has power to create the office by virtue of section 214, c. 6, which provides: "The mayor, by and with the advice and consent of the council, may appoint all such officers and agents as may be provided for by law or ordinance, and, in like manner, fill all vacancies among the same, except as otherwise provided by law." This doubtless was intended to confer power to appoint such minor officers and agents as might become necessary, from time to time, in the municipal government, and the necessity for whose services might arise; and the emergency which might call for their appointment, the legislature, owing to the narrow limits of the human mind, were unable to foresee; or it may be that this general provision was enacted because of the impossibility of the legislature entering into immensity of detail. The provision, it will be observed, leaves the appointment of such officers and agents discretionary with the mayor. He may appoint or not, as he chooses. So, the council may provide for appointment or not, or confirm or not, as it chooses. Thus, if respondent's contention be true, officers of the most populous cities in the state, which but a few years ago, under the most solemn judgment of the legislative branch of the government, were regarded as of such grave importance as to impel the enactment of a statute whereby the incumbents were appointed under life tenure, so as to secure more efficient service by removing them as far as possible from political and other improper influences, have now come to be regarded, by the same branch of the government to be of so little importance as to permit the creation and continuance of the offices and the appointment of the incumbents to stand on mere implication, and be subject to the mere

pleasure, whim, or partisan zeal of a mayor or city council. In other words, the legitimate result of the insistence is that the legislature intended, by the revision and repeal, to commit the peace and welfare, the protection of lives and property of the largest communities in the state to mere discretion of the mayor and council, acting jointly, and either one having the power to defeat the will of the other; and this, too, in the face of the fact that for comparatively small communities the same legislature made ample provision for peace officers. Could an interpretation of the several statutes, which would produce such results, and impute such intention, be regarded as warranted or reasonable, especially when the real object of the revision is considered? An application of the principles of construction hereinbefore considered forbids the imputation that the legislature designed such consequences. From time immemorial peace officers have been recognized as a necessity in civilized communities. In the Anonymous Case (case 459), 12 Mod. 256, the court said: "The late constable is not discharged till the new be sworn, because the parish cannot be without an officer."

It is true, under section 206, subd. 86, the city council has discretionary power "to create any office that may be deemed necessary for the good government of the city"; but this is a general provision which applies to all cities, as well to those where an express power is conferred in the revision to create a police force as to those where no such power is given, and what has been said respecting section 214 applies, in the main, with equal force to this subdivision. The fact that a city council, in the absence of any other provision of law, has discretionary power, under section 214 and subdivision 86, to create and fill necessary offices, does not show an intention on the part of the legislature to abolish the office of chief of police,

even though that office might also be created, and an incumbent appointed by virtue of those provisions. Section 311, c. 19, shows an intention to continue important municipal offices, as well as the incumbent therein, after the taking effect of the Revised Statutes. Nor does section 185, 193, or 215 militate against such intention.

Thus, by diligent examination of the several statutory provisions, to which we have been cited, and of others noticed in our researches, we have been unable to find any which would warrant us in saying that the office in question was abolished. The broad terms of the repealing statute, when construed in the light of the circumstances which surrounded the enactment, are manifestly in conflict with the spirit and purpose of the legislature, as shown in the revision, respecting the office of chief of police in cities of the first class. That statute is subject to the same rules of construction as other enactments, and the intent must prevail over the literal sense of its terms. While in terms it repealed the great mass of statute laws, and buried among them was the act of 1896, still there was no appreciable instant of time between the repeal and the re-enactment when the repeal could be in force. Therefore, in effect and operation, it must be limited to such provisions only as the legislature by the revision and repeal intended to abrogate.

*State* v. *Moorhouse*, 5 N. D. 406, is a case in many respects similar to the one at bar. There, as here, the controversy arose over the Revised Statutes and repealing act. It appears the main question was whether the office of district assessor, which had been created by statute prior to the revision, and an incumbent appointed, was continued in existence after the revision had taken effect. Mr. Justice Corliss, delivering the opinion of the court, said: "It is too plain for argument that one of the great

purposes of the legislation was to provide for the assessment of property throughout the entire state. To give effect to that purpose, we must limit the broad language of the repealing act, so that it will not defeat such purpose. Not having made provision in the new revenue law for the office of district assessor, and yet having clearly evinced a purpose that property in such territory should be assessed, and having in terms referred to that office and the district over which the jurisdiction of a district assessor extended, it does not admit of doubt that it was never intended by the legislature that those provisions of chapter 132, relating to the office of district assessor, etc., should be repealed." *Fullerton* v. *Spring*, 3 Wis. 667; *State* v. *Baldwin*, 45 Conn. 134; *Sheftels* v. *Tabert*, 46 Wis 439; *Laude* v. *Railway Co.*, 33 Wis. 640.

From the foregoing considerations, we are of the opinion that the office in question was not abolished, but continued in existence under the revision, and that the appellant, not having been removed, is entitled to hold the same, as provided in section 2482 of the Revised Statutes. The conclusion thus reached is, in accordance with the general principle of law, well established, that, in the absence of any restrictive provision of statute, municipal officers, hold over until their successors are elected and qualified. Tied. Mun. Corp. § 81; *Stratton* v. *Oulton*, 28 Cal. 45.

Such conclusion is likewise in harmony with the policy of the law, which is to have some one, at all times, in a public office to discharge the duties therof, and, in a doubtful case, such policy will greatly influence the interpretation of the law fixing the tenure of office. "The law abhors vacancies in public offices, and great precautions are taken to guard against their occurrence." Throop, Pub. Off. § 308; *State* v. *Seay*, 64 Mo. 89.

The remaining question is whether the appellant is entitled to the emoluments of the office during the time of his suspension. To determine this question, reference to the act of 1896 again becomes necessary. Section 10 of that act empowered the board of police and fire commissioners to suspend any members of the police department, including the chief, "at any time for good cause, or when the good of the service will be subserved thereby, upon the concurrence of three members thereof." The suspension in this case, however, was evidently made by virtue of section 11, which, so far as material here, reads: "Any citizen may prefer and file with the board a complaint and charges against the chief of either department, or any officer, member or employé thereof; immediately upon the filing of such charges   *   *   *   the board shall suspend such officer or member complained of, if he be not already under suspension, and if in their judgment the charges warrant suspension, until the matter can be heard and investigated." It being admitted that charges were preferred, the board clearly had the power, under this section, to suspend the appellant until a hearing could be had, and, in a case of ordinary suspension without further penalty, no doubt, the board could proceed as provided in the same section; but in any case where the suspension was to be without pay, or a removal from office was to follow, the board was also bound to have its proceedings conform to the provisions of section 17, which reads as follows: "The chief and captain of police and the chief engineer and assistant engineer of the fire department, each and all of them, shall be subject to suspension from office for cause, by vote of three members of the board, at any time. Any officer so suspended shall thereupon cease to exercise the functions of his office until he shall be reinstated. In case of suspen-

sion, the board shall at once consider and examine the charges against the officer suspended, giving him an opportunity to be heard in his own defense. After hearing the matter, the board shall determine whether the charges are sustained. If the charges shall not be sustained by the board, the officer shall be immediately reinstated. If the board shall determine that the charges are sustained, it shall at once determine whether the good of the service requires that the suspended officer shall be removed from office, or shall be suspended from office without pay for a fixed period, and in all cases a vote of three members of the board shall be sufficient to determine that the charges are sustained, and to fix the punishment by removal from office or otherwise. The board shall communicate its decision to the officer charged in writing, and their decision shall be final and conclusive in all cases."

It will be noticed that under this section, if the officer was to be suspended without pay, it was incumbent upon the board to proceed at once to consider and examine the charges, and to give him an opportunity to be heard in his own defense. Then upon the officer having been or having had an opportunity to be heard, it was the duty of the board to determine whether the charges were sustained, and, if not sustained, the officer was entitled to "be immediately" reinstated. If sustained, then it was equally its duty to "at once determine" whether the good of the service required that the suspended officer should be removed, or should "be suspended from office without pay for a fixed period." It will further be noticed that, from the time an officer was suspended under this statute, he was bound to cease performing the duties of the office until reinstated. These same provisions of the act were considered in *Pratt* v. *Board, supra,* where a similar

question as to procedure was involved, and we refer to that case for a more full discussion on this point.

In the case at bar the officer was suspended from office by the board on July 14, 1897, and remained suspended, without a hearing or an opportunity to be heard, so far as shown by the record, until January 1, 1898, when, as is conceded, the powers of the board were abrogated, and it ceased to exist, by reason of the taking effect of the Revised Statutes. It is shown that the officer, though prohibited by statute to perform the duties of the office, was at all times ready and willing to do so, and that, after the abrogation of the board and failure of the charges as a sequence, he applied to the mayor, to be permitted to discharge the duties, who also refused to recognize him. Thus, during all the time from the 14th of July, 1897, to the 1st of January, 1898, the officer remained suspended by order of the board, and thereafter, in effect, suspended by the refusal of the mayor to recognize him as an incumbent, without a hearing or an opportunity to be heard as provided by law; and now, after such an unwarranted and remarkable proceeding, in direct opposition to the plain provisions of statute and to judicial interpretation, this court is asked to declare in solemn judgment that the incumbent, thus denied a hearing, so far as the record shows, is not entitled to the emoluments of the office during the time of his suspension. Upon what ground, it may be asked, shall we so declare? The record answers, because the board and mayor have failed to perform their duty under the law respecting the charges. This proceeding was a manifest violation of the very letter and spirit of the statute. To hold that, under the circumstances of this case, the incumbent of a public office had forfeited his right to the emoluments of the office, would be a menace to good government, because it

would enable the suspending power to be exercised from mere ill-will, caprice, or other improper motive, regardless of the public weal. Competent persons would doubtless be loath to enter the public service, under such a condition of affairs, if their salaries could be forfeited and their reputations attacked, for an indefinite period, by mere suspension, without an opportunity to be heard. No such power will be aided by judicial construction. It savors too much of despotism and injustice, and will not be countenanced, except upon the mandate of positive law.

Whether the suspension in the first instance was merited we have no means of knowing, and, because of the total failure of the suspending power to provide for a hearing, we would not be justified in assuming that it was so. If, however, the appellant failed in the performance of his duty, or was guilty of improper conduct, he ought to have been suspended, and then his case promptly heard, and, if upon the hearing it had been ascertained that the charges were sufficient and sustained, he ought to have been as promptly removed, or suspended without pay, as the evidence might have warranted. In such event, forfeiture of salary could not have been questioned. Plain business principles as well as the law dictate such a course, and persons endowed with a public trust must not forget that they are bound by every principle of honor to discharge public affairs with the same fidelity as they would their own. But, aside from these considerations, we have already decided that the appellant was and is the lawful incumbent, or *de jure* officer, and, in the absence of a lawful suspension without pay, the right to hold the public office includes the right to receive the salary, which is an incident to the office itself. This is the settled rule in this state. *Kendall* v. *Raybould,*

13 Utah 226; *People* v. *McAllister*, 10 Utah 357. Such also, appears to be the rule in California. *Stratton* v. *Oulton*, 28 Cal. 45; *Dorsey* v. *Smith*, Id 21.

The cases cited by counsel for the respondent on this point cannot be regarded as authority, because the circumstances which control those decisions are different from those in the case at bar. The point respecting a defect of parties does not appear to be well taken. We are of the opinion that the court below erred in sustaining the demurrer and dismissing the petition, and therefore the case must be reversed, and the cause remanded, with directions to grant the writ. It is so ordered.

Zane, C. J., and Miner, J., concur.