### TAYLOR v. LEE, Governor, et al.

No. 7500. Decided January 13, 1951. (226 P. 2d 531.)

304

See 99 C. J. States, sec. 217. Power to remove public officer without notice and hearing, see note 99 A. L. R. 341. See, also, 43 Am. Jur. 50.

*Clifford L. Ashton,* Salt Lake City, for appellants.

*Parnell Black,* Salt Lake City, *Rawlings, Wallace, Black, Roberts & Black,* Salt Lake City, for respondent.

LATIMER, Justice.

On January 3, 1950, defendant J. Bracken Lee, Governor of the State of Utah, directed a letter to plaintiff Milton B. Taylor advising him that in accordance with Section 82C—2—2, U. C. A., 1943, he, Taylor, was being removed as a member of the Commission of Finance. The reason assigned in the letter for the removal was that prior to the time the Governor assumed office Taylor as a member of the Commission had approved certain bond purchases from a local broker contrary to the intent and spirit of Section 82C—2—34, U. C. A., 1943. The charge

was predicated upon information furnished to the Governor by the newly appointed chairman of the commission. Prior to the sending of the letter of removal, Taylor had been in at least two conferences with the Governor in which the questionable method of purchasing the bonds had been discussed. One hold-over commissioner, in addition to Taylor, had participated in one of the meetings, and in the transactions, but he resigned for other reasons prior to Taylor's removal.

On January 10, 1950, plaintiff filed his complaint in this action in the Third Judicial District Court alleging in substance that he had not been furnished with information concerning the charges against him, that he had not been given an opportunity to defend himself, and that the act of the Governor in removing him was illegal and without force and effect. In his complaint, plaintiff sought to have himself reinstated as a commissioner and prayed that an appropriate writ be issued out of the court directing and commanding the Governor to certify to the court any and all records, charges and findings pertaining to plaintiff's removal from office. The writ was issued and served upon the Governor and he was directed to certify his proceedings to the court. There are other defendants and relief was sought as against them, but all issues are dependent on and controlled by those between the plaintiff and the Governor. For that reason we shall hereafter treat the action as one solely between the Commission and the Governor.

After being served with the writ, and on or about January 21, 1950, the Governor addressed a letter to the plaintiff which stated in substance the Governor's conclusions with respect to his claim of prior hearings and which included the following paragraph:

"In your complaint in District Court, you allege the lack of opportunity to defend yourself against the charges I have made. As I have pointed out,

however, I feel that you were afforded two opportunities to be heard; but in order to avoid any suggestion that I have not given you a fair hearing, I am hereby requesting you to appear at my office in the State Capitol Building, on January 26, 1950, at 2 p. m., at which time I will again present to you the original records of the Commission of Finance, supporting the charges with respect to the transactions enumerated below. At this hearing, you will again be given the opportunity to be heard. I have no objection to your being accompanied by counsel and, in accordance with my usual policy, this hearing will be public unless you request it to be otherwise. In the event you do not appear, I shall conclude that you do not desire another hearing before me."

In the next succeeding paragraphs of the letter were listed the thirteen bond transactions which the Governor claimed were contrary to the intent and spirit of the law and upon which he founded his charge of improper performance of duty.

On or about the 23rd day of January, 1950, plaintiff filed a petition in the Third Judicial District Court in which he alleged in substance that he had received notice of a hearing the Governor proposed to hold on the 26th day of January, 1950; that he had previously instituted an action in the court to require the Governor to reinstate him in office; that the scheduled hearing for January 26, 1950, was an attempt to interfere with the court processes and to oust the court of jurisdiction to hear and determine plaintiff's right to office; that in order to protect his rights and privileges it was necessary that an order be issued restraining the Governor from proceeding with the intended hearing. A citation was served on the Governor in which he was required to appear and show cause why he should not be restrained and enjoined from proceeding with his scheduled hearing. A motion was made by the Governor to dismiss the order to show cause and, after the issues were presented and argued, the court granted the motion to dismiss for the reason that the court was without jurisdiction to restrain the Governor from giving the plaintiff a hearing.

On January 26, 1950, plaintiff, together with his coun-

sel, appeared at the Governor's office at the scheduled time. The record indicates that at that time plaintiff stated his contention in the following language:

" * * * We feel that we are entitled to be informed at the outset whether you as the Governor of the State regard Taylor at this time as being Commissioner. If this hearing today is a matter in explanation of or in defense of the dismissal of Taylor, then, in our opinion, right or wrong, there is no occasion for this hearing.

* * * * * *

"Now if Taylor is recognized by you, Governor, today, as the Commissioner duly appointed, holding office lawfully in the Department of Finance of the State of Utah, and entitled to his privileges and emoluments as of this time and date, the hearing in our opinion would be proper. If you as Governor regard at this time Mr. Mason as being the Commissioner and Mr. Taylor to be out of office as such, then we believe we shouldn't submit to a hearing at this time."

After further discussions as to the contention of each of the parties, the Governor explained that he was unable to determine the status of Taylor as this involved a legal question, but that he wanted to afford Taylor a fair opportunity to be informed of the charges and defend against them. The following statements were among many made:

Mr. Black:

"Governor, if you are willing now to take whatever official action is necessary and proper and available to reinstate Taylor to his position as Commissioner in the Commission of Finance, then we will welcome an opportunity to be charged, to be heard, and to defend as best we can. Unless you as Governor are willing to do that, we cannot and will not submit to a hearing."

The Governor:

"I still think that it goes back to you, Mr. Taylor; you have got to decide what your position is. It isn't up to me to decide it and I think you have got to enter this hearing on the basis of what you think and what you contend.

"We have called this hearing now, we have got the reporter here, we have got our evidence all prepared and I would like to go ahead and present it. I would like to have you and Mr. Taylor remain and hear it. We would like to furnish you copies of all the documents; and we would like to have

Mr. Taylor defend himself on each and all of the items—would like to
have you defend him.

"We certainly want him to have a fair and open hearing and I can see no
harm in a hearing from any standpoint and I cannot see where a case in
court is affected by it. It is just a matter from our standpoint of wanting
to be fair with Mr. Taylor."

A further colloquy as to whether plaintiff must be reinstated by the Governor before plaintiff would participate in a hearing was ended by plaintiff and his counsel walking out. Thereupon the Governor proceeded with the hearing, a witness was sworn and testified, and documentary and oral evidence was heard by the Governor.

On February 3, 1950, the Governor addressed a letter to the plaintiff in which he stated he had carefully examined the evidence adduced at the additional hearing on January 26, 1950, and based thereon he reaffirmed his previous action in removing plaintiff for cause.

In accordance with the requirements of the writ, the Governor certified his records to the district court including the evidence taken in the last hearing. Subsequent thereto a court hearing was held, principally on the question as to whether the Governor had exceeded his authority in removing plaintiff as a commissioner without furnishing him with charges and without affording him a legal hearing. In addition to the record as certified to by the Governor, certain evidence was introduced by plaintiff over the objection of counsel for the Governor. This objection was based upon the claim that the proceedings were in the nature of certiorari and evidence could not be introduced either to augment or impeach the record as made by the trier of the facts. The trial judge held that the form of action was immaterial, overruled the objection and admitted the evidence. After both sides rested, he took the matter under advisement and subsequently rendered a decision in which he held that the removal was illegal for the reasons asserted by plaintiff. However, he did not

order the matter referred back to the Governor for an appropriate hearing, but concluded to rule on the question of cause. In his memorandum decision, he gives as the reason for so doing, that the facts presented to the Governor must eventually be tested for cause, and since they were shown in the record before him, if they were not then used as a basis for a finding on the issue they would subsequently be presented for the same purpose. He, therefore, concluded it desirable from the standpoint of public interest to dispose of the question on the record as made. He ruled that cause had not been shown and ordered plaintiff reinstated as commissioner. Certain of the defendants, including the Governor, appealed from that decision.

The appeal poses the following questions: (1) Is a commissioner, appointed for a definite term, who is removable only for cause, entitled to be furnished with written charges, and afforded a hearing prior to being discharged? (2) What procedure must the Governor follow in order to assure the removed officer a full and fair hearing? (3) What was the legal effect of the purported hearing on January 26, 1950? (4) To what extent can this court review the Governor's findings? (5) Was there cause to dismiss the plaintiff? We shall treat these seriatum.

The Legislature of this state has not spoken with respect to the necessity of a hearing before removing, for cause, certain non-elective state officers, including the Commissioners of Finance. It, therefore, becomes important to determine whether the Constitution, statutes or decisions of this court offer guide-posts which point the way to a solution of the first problem presented.

Section 82C—2—2, U. C. A. 1943; Section 1, Article V; and Section 1, Article VIII, of the Constitution of the State of Utah are applicable. They provide as follows:

### Section 82C—2—2, U. C. A. 1943:

"The administration of the department shall be under the supervision, direction and control of a commission which shall be known as the commission of finance. The commission of finance shall be composed of three members who shall be appointed by the governor by and with the consent of the senate, whose terms of office shall be six years * * * . *Any member of the commission may be removed for cause by the governor.* * * * " (Emphasis added.)

### Section 1, Article V, Constitution of the State of Utah:

"The powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the Executive, and the Judicial; and no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others, except in the cases herein expressly directed or permitted."

### Section 1, Article VIII of the Constitution of the State of Utah:

"The Judicial power of the State shall be vested in the Senate sitting as a court of impeachment, in a Supreme Court, in district courts, in justices of the peace, and such other courts inferior to the Supreme Court as may be established by law."

Removal from office may occur under a variety of circumstances, but in this state the Legislature has prescribed at least three different methods. (We are not here concerned with removal by impeachment or by courts martial.) The first method may be purely arbitrary and without any substantial reason. This method is permitted to remove a member of the Liquor Control Commission by virtue of Section 46—0—47, U. C. A. 1943, which provides that each commissioner shall be subject to removal at any time at the pleasure of the Governor. The second method is removal for cause after notice and hearing. Section 80—5—37, U. C. A. 1943, which deals with the State Tax Commission, provides that a member may, after notice and hearing, be removed by the Governor for neglect of duty, inefficiency and malfeasance. The third method, which is applicable to a majority of commissioners, is for cause with the statute silent as to procedural steps.

The first and second methods offer no particular problems as there is no procedural uncertainty. The difficulties are encountered when the only limits prescribed by the Legislature are "for cause" and a procedural pattern has not been established by statute or previously decided cases. There is, however, a fair inference from the wording of the statutes that the Legislature intended that removal for cause should encompass more than summary dismissal. A contrary inference would place removal for cause and removal at pleasure on the same plane.

The precise question has been before the courts of last resort in most jurisdictions, and it would seem that a clear cut doctrine would have been established. Such has not been the case and this is undoubtedly chargeable to the fact that the constitutional and statutory provisions of each jurisdiction directly influence the results reached. This court has not passed on the principle, but certain cases, which will be referred to later, point clearly towards the concept that notice and a hearing are necessary before removing an officer for cause, particularly where, as in this case, we have a statute which provides for an appointment for a definite term and the appointee is entitled to hold the office for that term unless legal grounds are found to exist which will permit his removal.

Counsel for the Governor contend that if a notice and hearing are necessary the removal proceedings are judicial and Section 1, Article V of the Constitution forbids the Governor from exercising judicial functions. This argument is, in a sense, self-defeating, as it would require a holding that the Legislature could not grant to the Governor the right, after notice and hearing, to remove an officer. We do not believe the Constitution intended to fix the limits of the three departments with such rigidity, and previously decided cases affirm this principle.

In the case of *People* v. *McAllister*, 1894, 10 Utah 357, 37

P. 578, this court likened the procedure to that prescribed for crimes and said 10 Utah at Page 372, 37 P. at Page 581:

" * * * A removal for cause is a judicial act which affects the reputation and rights of the accused. It is in law a punishment for crime, and the proceeding provided by statute can no more be dispensed with in such a case than a court can disregard the statutory provisions in the trial of a cause where a person is charged with the commission of an offense."

In the case of *Gilbert* v. *Board of Police & Fire Commissioners of Salt Lake City,* 1895, 11 Utah 378, 40 P. 264, 265, this court decided that when notice and hearing are required the proceedings are judicial in character, but it did not pass on the constitutional question presented by the separation of the powers between departments of government because that issue was not involved. In that case, it was stated:

"These are the several provisions of the law under which the board in this case proceeded to remove the relator. It is clear that the power here conferred is judicial in its nature, because, in order to effect a removal, the board is required to prefer charges, afford the accused an opportunity to be heard, examine witnesses, and decide the question upon evidence. All such proceedings are of a judicial character. The term 'judicial,' however, as applied to the actions of boards of this class, is not to be received in the sense ordinarily applied to courts of justice. The words 'judicial power,' when applied to such courts, mean the authority vested in the judges. Bouvier. * * * "

The same principle of law was followed in the cases of *Clark* v. *Board of. Police & Fire Commissioners of Salt Lake City,* 1895, 11 Utah 399, 40 P. 269; *Pratt* v. *Board of Police & Fire Commissioners,* 1897, 15 Utah 1, 49 P. 747; *Heath* v. *Salt Lake City,* 1898, 16 Utah 374, 52 P. 602; and *Pratt* v. *Swan,* 1898, 16 Utah 483, 52 P. 1092.

In *Mechem on Public Officers,* paragraph 455, page 289, the general rule is announced to be as follows:

"Proceedings for the removal of an officer for cause are judicial in their nature and must be had before tribunals clothed with judicial powers. The fit and appropriate tribunal, therefore, in ordinary cases is the court of law, but this judicial power may be, and often is, expressly conferred upon the governor, mayor or other officer or board having the power of removal.

"The proceeding being thus a judicial one, the power must be exercised

under the same limitations, precautions and sanctions as in other judicial proceedings."

Accepting the proposition that removal from office is a judicial function, this does not compel a holding that when the Legislature authorized the Governor to remove an officer for cause the provision ran afoul of Section 1, Article V, of the Constitution of this state. That article provides that no person charged with the exercise of powers properly belonging to one of these departments shall exercise any functions appertaining to another. We call attention to the use of the phrase "exercise of powers *properly* belonging to one of these departments" (emphasis added), for the reason that at the time the constitutional provision was adopted there was a rule to the effect that the power of removal from an appointive office was incident to the power to appoint, particularly where the tenure of office was not for a definite term, and many well considered cases held that such power extended to offices with fixed terms. The qualified expression indicates the members of the Constitutional Convention must have considered that there were powers which were not so inherently a part of one department that other departments would be forever precluded from exercising those which were necessary to a proper functioning of that particular department. It seems obvious that the right to remove for cause might be a power which properly belongs to all departments.

This court, in a number of cases, has discussed the term "judicial power" as employed in the Constitution and has dealt with some necessary overlapping of the powers of the three departments. Mr. Justice WOLFE, in *Tite* v. *State Tax Comm.*, 89 Utah 404, 57 P. 2d 734, 737, shows the evolution of the three department form of government and in that case he makes the following statement: "But so indistinct has become the line between even this traditional judicial power and executive functions that this court in the case of *Citizens' Club* v. *Welling, Sec'y of State,*

83 Utah 81, 27 P. 2d 23, held that a law which gave him the power on hearing to forfeit the charter of a club was constitutional."

He uses the following quote from *Brown* v. *Turner,* 70 N. C. 93:

"(Although) the executive, legislative and supreme judicial powers of the government ought to be forever separate and distinct, it is also true that the science of government is a practical one; therefore, while each should firmly maintain the essential powers belonging to it, it cannot be forgotten that the three co-ordinate parts constitute one brotherhood, whose common trust requires a mutual toleration of the occupancy of what seems to be a 'common cause of vicinage,' bordering the domains of each."

In *Citizens' Club* v. *Welling, Sec'y of State,* 83 Utah 81, 27 P. 2d 23, 24, Mr. Justice STRAUP discusses "judicial power" and makes the following statement concerning the phrase:

"Both parties agree that the term 'judicial power' as employed in the Constitution is not capable of precise definition, and what is judicial, and what not, is largely to be determined by the nature or character of the function or power conferred and exercised or to be exercised. From the cited cases by the appellant we may deduce these principles: That while the term 'judicial power' embraces all suits and actions whether public or private, it does not necessarily include the power to hear and determine matters not necessarily in the nature of a suit or action between parties; that the term does not apply to those cases where the judgment is exercised or is to be exercised as a mere incident to the execution of a ministerial power or duty; that power to hear and determine matters more or less affecting public and private rights may be conferred upon and exercised by administrative and executive officers without offending constitutional provisions relating to the judicial power vested in the courts * * * ."

In an article published in the *Michigan Law Review,* Vol. 3 (1905), p. 341, the author deals with removal of public officers from office. He makes the following comment:

"There seems to be no doubt then at the present time that it is constitutional to impose upon either the state or local executive officers the power to remove for cause, nor need it be held that such a power is executive in its nature to justify such a conclusion. We believe that removal for cause is judicial in its nature, not executive, but we do not believe that this forbids the exercise of such a power by the officers of the executive departments. The doctrine of the 'separation of powers,' says Prof. Goodnow, 'is

a description of what ought to be rather than what is.' It does not mean, as some suppose, that all power, executive, judicial or legislative in character must be exercised exclusively by the executive, judicial and legislative departments, respectively. If this were so government would be impossible. This is not what Montesquieu meant when he expounded this famous doctrine, nor is it what the 'Framers' meant when they made it the foundation of the Constitution of 1787. It can only mean that there are certain powers so inherently legislative, executive, or judicial in character that they must be exercised exclusively by their respective departments.

"That removal for cause is not such a power is evident. It is quasi-judicial or judicial in nature but not judicial in the sense that it comes within the inhibition of the clause 'all judicial power shall be vested in the courts.'"

In the light of these principles, we believe that what the members of the Constitutional Convention intended when they spoke of the powers properly belonging to each department were those powers which were so inherently legislative, executive or judicial in character that they must be exercised exclusively by their respective departments. We further believe that the removal of an officer is not so inherently a part of the judicial department that the removal cannot be exercised by either of the other two departments.

Having concluded that the Legislature could grant to the Governor the right to remove for cause even though it might involve the exercise of some power usually considered judicial, we consider the following statement from Section 454, *Mechem on Public Officers, p. 287*, to reflect the correct principle on the necessity of notice and hearing:

"In those cases in which the office is held at the pleasure of the appointing power, and where the power of removal is exercisable at its mere discretion, it is well settled that the officer may be removed without notice or hearing.

"But on the other hand, where the appointment or election is made for a definite term or during good behavior, and the removal is to be for cause, it is now clearly established by the great weight of authority that the power of removal can not, except by clear statutory authority, be exercised without notice and hearing, but that the existence of the cause, for which the power is to be exercised, must first be determined after notice has been given to

the officer of the charges made against him, and he has been given an opportunity to be heard in his defense."

In disposing of the second question, which concerns the procedure for removal of an office-holder for cause in those cases where legislative provisions have not been enacted permitting an appeal to a commission, such as was involved in *Bodmer* v. *Police Mutual Aid Ass'n*, 94 Utah 450, 78 P. 2d 640, we hold that the minimum requirements are these: (1) A written notice of the nature of the charges couched in ordinary and understandable language; (2) a notice of the time and place of hearing; (3) an opportunity by the office-holder to be heard and answer the charges; (4) the right to be represented by counsel, with opportunity for cross-examination; and (5) the presence of a reporter to preserve the testimony so that, if necessary, the question of cause can be made the subject of judicial review. While these requirements would appear to require a full dress legal hearing, the proceedings can and should be administratively conducted. If the hearing is apt to continue over an extended period of time, there is no apparent reason why the Governor should not appoint a referee to hear the evidence and make recommended findings.

The reason for throwing this cloak of protection around an office-holder is to assure to him the right granted by the statute, namely, that he shall be removed for cause only and not for political or trifling reasons. Cases of this type usually arise as an aftermath of a fierce political battle when man's judgment is still warped by the heat of the political campaign. While in this country there is no property right in an office, there are other important rights which the office-holder enjoys and which can be gravely injured by an unwarranted removal. Removing for cause takes a form of punishment; it infers that office-holder has failed to perform his duties;

or was incompetent or unsuitable for the position to which he was appointed and directly reflects upon his official or personal qualifications. Before the good name of an office-holder is clouded by removal, he should be given a reasonable opportunity to present his side of the controversy, and, in addition, before his cause is finally adjudicated, he should be afforded the right of having a disinterested court determine whether the removing officer acted arbitrarily, capriciously and unreasonably. Cognizance should be taken of the fact that he who originally hears the charges has, in most instances, already arrived at a decision to remove, and, as a consequence the original hearing is before one who lacks the impartiality of a disinterested judge. Because the Governor failed to meet the minimum requirements hereinabove set forth, we hold that the original removal order was invalid.

The third question involves the effect of the belated hearing on January 26, 1950. When the Governor was served with the original court petition on January 11, 1950, he was apprised of the fact that plaintiff complained he had not been accorded the right to be properly informed of the charges and defend against them. The Governor was then faced with two alternatives: Either to stand on what he believed to have been a hearing; or, to afford to plaintiff the rights he claimed to have been denied. The Governor chose the latter, which we believe to have been the appropriate choice. He, therefore, itemized the charges, offered to give plaintiff the benefits of the procedural steps we have previously mentioned and set the date of hearing within reasonable limits. Plaintiff appeared with counsel but refused to participate unless the Governor fully reinstated him as a commissioner. We are inclined to the view that this objection was too technical. Admit-

edly, the plaintiff had been in some degree injured by the removal order, but this damage might have been repaired had plaintiff elected to accept the Governor's offer of an appropriate hearing. The most plaintiff was entitled to in the way of notice and hearing has been previously set out in this opinion and the proposed hearing granted him those rights. Assuming the Governor would again find cause, there remained only the question of compensation and the emoluments of the office during the interim between the removal order and the hearing, and these could have been adjusted by the Governor or the court. Where proceedings must be more or less informal, there is no good purpose in one seeking to make them so rigid that a prior error in procedure cannot be corrected. Plaintiff had already sought recourse to the court and if the original removal was invalid he would hold office and be entitled to its emoluments until legally removed. The court was vested with jurisdiction to hear that question. Moreover, the Governor was in a dilemma for the reason that he did not know whether his act in removing Taylor would be declared legal or illegal, and there is respectable authority to the effect that reappointment of an officer with knowledge of his previous misconduct in a matter not involving moral delinquency is a condonation thereof as respects the right of the appointing power to remove him. See *Throop on Public Officers* (1892) Paragraph 378.

It may be that had each side yielded a point and not remained adamant, the issue could have been properly tried and each party's rights respected. Be that as it may, the real issue in the case was the question of cause and if plaintiff was offered a full and fair opportunity to meet the charges, present his defense and preserve his record for appeal, then it is difficult to see how he was prejudiced because the Governor was unprepared to solve a legal question as to plaintiff's then existing status.

Plaintiff complains that the hearing was ex post facto and therefore unavailing. This contention overlooks the fact that plaintiff had complained to the court that the removal was a nullity because of procedural errors. It was to remove any doubt concerning these that the second hearing was held. If the Governor's original order was invalid then plaintiff was a commissioner; otherwise he was not. That involved a legal question to be answered by the court. If plaintiff was found by the court to be a commissioner, then a proper hearing was necessary before he could be removed. Any evidence taken before the effective date of the legal removal would not be introduced too late. Conceding the Governor was in error for procedural informality, it would not be compulsory that he delay correcting the error until the gamut of court action had been run. He need not have his hands tied until he was affirmed or reversed by this court. He was at liberty to correct any deficiencies and the final order of removal could be made effective at the proper time. We can see nothing wrong with the Governor who, believing he has proceeded correctly, nevertheless decided to remove all doubt by offering to meet plaintiff's demands for a hearing. On the other hand, we can hardly approve the attitude of a contumacious plaintiff who complains about the Governor's failure to give him a hearing and then refuses to participate when an attempt is made to grant him the rights he claims he was denied.

The trial judge held the order of removal was invalid and that the second hearing could not be used as a foundation for a subsequent removal. However, this holding is inconsistent with his action in considering the testimony adduced at the second hearing to determine the question of cause. Accepting the trial judge's procedure, we must come to the conclusion that he treated the second hearing as one on the merits, and gave plaintiff the benefit of the lack of evidence to establish the charge. Plaintiff is in

an inconsistent position to contend that the record in the last hearing can be used to support the court's conclusion that there was not cause, but cannot be used for the purpose of sustaining the Governor in his contention that there were reasons for the dismissal. The right to notice and hearing can be waived, and we believe that plaintiff's acts, coupled with his representation to this court that he is prepared to defend against cause on the record as it now exists, constitute a waiver of any procedural defects.

The troublesome issue in this case centers around the question of cause. Preliminary to disposing of this last question, we answer the fourth question and point out what we believe to be the power of this court to review the findings of the Governor. The Constitution and subsequent statutes have given to the Governor the right to appoint the principal state officers and the statute gives him the right to remove a commissioner of finance for cause. Accordingly, the judicial department should interfere only to the extent of determining whether the Governor has acted in an arbitrary manner. We believe the best rule to be that if there is any evidence of a legal and substantial basis reasonably tending to support the Governor's findings, then he has not been arbitrary and his decision should be affirmed. We prefer this rule for the reason that it preserves the American tradition that the Governor should not remove an officer, which act carries with it the possible ruination of the man removed, until and unless there is some showing of misconduct or otherwise that he does not possess the qualifications, fitness and ability to perform the duties of his office. On the other hand, the rule permits the Governor to exact a high degree of efficiency from principal appointive officers without interference by the judicial department. We test the facts of this case by the foregoing rule.

We first direct attention to the fact that at the trial of the cause in the court below and at the arguments in this court, counsel for the Governor stated that there was no good contention that plaintiff was guilty of fraud or dishonesty in connection with any of the transactions referred to in this action. This admission limits the issues largely to the question of incompetency or inefficiency on the part of plaintiff.

Section 82C—2—34, U. C. A. 1943, provides as follows:

"The boards or officers of the several taxing districts of the state shall offer in writing all original bond issues and all refunding issues of bonds of their respective taxing districts to the commission of finance prior to advertising the same for sale, and the commission of finance shall, within five days after receipt of such written offer, either reject such offer or notify the issuer of the terms and conditions on which it is willing to purchase such bond issue, and, if the officials of the issuer are of the opinion said bond issue may be sold elsewhere at a lower rate of interest or on better terms, such officials may reject the offer of the commission and proceed to sell such bond issue elsewhere."

We pause to wonder why the present chairman of the Commission, who apparently instigated the investigation, concluded the only purpose of the statute was to outlaw brokers. We believe reasonable men might reach a contrary conclusion. We find nothing in the section which states an issuer cannot be represented by an investment counselor, and yet, it would have been a simple task for the Legislature to have provided that the Commission could not purchase securities offered through investment houses. Moreover, the first time the Legislature used the wording, a two-fold legislative intent is expressed. In 1917, the Legislature passed an act creating the Industrial Commission. Section 48 of that act, which is Chapter 100, p. 320, Laws of Utah, 1917, provides as follows:

"The commission shall have power to invest any of the surplus or reserve belonging to the State insurance fund in bonds of the United States or federal land banks, of the State of Utah, or of any county, city, town or school district of the State of Utah, at current market prices for such bonds; or in first mortgages on real estate at not to exceed forty per cent of the

cash value thereof; provided, that such purchase or investment be authorized by a resolution adopted by the commission and approved by the State Board of Examiners; *and it shall be the duty of the boards or officers of the several taxing districts of the State in the issuance and sale of bonds of their respective taxing districts to offer in writing to the commission, prior to advertising the same for sale,* all such issues of the taxing districts so issuing such bonds; and said commission shall within ten days after the receipt of such written offer, either accept the same and purchase such bonds or any portion thereof at par and accrued interest, or reject such offer in writing; * * * ." (Emphasis added.)

This clearly indicates that the Legislature intended to restrict the investment of state funds to certain types of investments, and, in order to keep that market open to the state, a taxing district was prohibited from dealing on the open market until the state had an opportunity to exercise a statutory option to purchase. It is a mandate to the taxing districts and not to the commission. If the later amending acts are considered, it is readily apparent that subsequent legislatures opened the door to permit more latitude for state departments in the purchase of bonds, as the 1917 act specifically provided that the purchase of bonds should be at par and accrued interest, but in 1921 this limitation was removed and has never been reincorporated.

It is for a claimed intent to violate the terms of Section 82C—2—34, U. C. A. 1943, supra, that the plaintiff was removed and the specific charges arise out of transactions had between the Commission and Lauren W. Gibbs. The transactions will be hereinafter set forth in four groups, the first dealing with ten transactions, substantially the same in character, which involved the purchase of certain municipal and school district bonds through Lauren W. Gibbs as agent for the municipalities. The second group deals with three transactions, all of which involve either direct purchases from the municipality or the waiver of purchase by the Commission. The third group consists of three transactions involving the exchange of securities. The fourth group concerns a transaction with

the town of Orderville, Utah, which involved an attempt to sell bonds direct to the Commission.

The transactions involved in the first group are the following:

| Date | City | Amount | Yield | Interest | Premium Paid | Total Amt. Paid To Gibbs |
|---|---|---|---|---|---|---|
| 3/ 5/48 | St. George | $60,000 | 2⅝% | 2.75% | $ 697.90 | $60,720.81 |
| 4/ 5/48 | St. George | 20,000 | 2⅝% | 2.75% | 235.90 | 20,243.53 |
| 6/ 9/48 | Kanab | 25,000 | 2.7% | 3.5% | 2,344.40 | 27,363.84 |
| 7/ 8/48 | Duchesne Bd. of Ed. | 50,000 | 2.7% | 3.5% | 5,751.20 | 55,861.37 |
| 8/ 5/48 | Duchesne | 12,000 | 2.7% | 3.5% | 788.85 | 12,813.35 |
| 8/20/48 | Orem | 43,000 | 2.75% | 3⅞% | 3,448.15 | 46,468.25 |
| 10/26/48 | Levan | 11,250 | 3% | 4% | 1,339.32 | 12,620.57 |
| 12/ 1/48 | Orderville | 13,000 | 3% | 4%—5 yrs. 3%—after | 572.75 | 13,616.08 |
| 12/17/48 | Sunset | 15,000 | 3% | 3.75% | 1,974.30 | 16,417.69 |
| 12/30/48 | Escalante | 20,000 | 3% | 3¾% | 1,488.05 | 21,988.86 |

At first blush it might appear that there has been a deliberate plan to defeat the intent of the Legislature as expressed in Section 82C—2—34, supra, and grant to Lauren W. Gibbs a profitable and monopolistic preference contrary to the act and to good business methods. Apparently this is the view taken by the Governor. However, when a careful analysis is made of the statute and the facts in this record and consideration is given to the absence of any evidence that plaintiff knew, or could be charged with knowledge, that the municipalities were not employing Gibbs for his knowledge concerning bond issues but were paying him because he alone could get favorable consideration, it is clear that no legal cause for removal is present.

In the ten transactions involved under group (1), the issuer enacted an ordinance authorizing the issuance and sale of the bonds. In all instances save one the wording was identical, and it was as follows:

"Section 6. Be It Further Resolved that the contract for the sale of said bonds to Lauren W. Gibbs is ratified and confirmed, subject to the statutory rights of the Commission of Finance of the State of Utah and the said Lauren W. Gibbs is hereby authorized to act for the Duchesne County School District in presenting said required offer to the State of Utah, and in case of rejection the President and Clerk are authorized to deliver said bonds to him upon his payment to the Treasurer of the par amount thereof with accrued interest to date of delivery; and in the event of acceptance by the State of Utah of said offer, the said Lauren W. Gibbs is authorized to complete the details of sale and delivery on behalf of the Duchesne County School District, receiving said bonds for delivery to the State after first having paid to the Duchesne County School District the par amount and accrued interest to date of delivery, it being understood that Lauren W. Gibbs is to receive the amount above par, if any, for which the bonds are sold, as partial consideration for services heretofore rendered to the Duchesne County School District."

The Commission of Finance, and the Board of Examiners, in certain instances, approved the purchase of bonds by an appropriate resolution. We set up one for informative purposes:

"

| Roll Call | | |
| --- | --- | --- |
| Voting | Aye | Nay |
| J. P. Beesley | X | |
| J. F. Pingree | X | |
| M. B. Taylor | X | |

Resolution No. 55, State
Insurance Fund

Re: Board of Education, Duchesne School District Refunding Bonds

Amount: $50,000.00
Premium: $ 5,751.20
Interest: 3.50% Accrued Int: $110.17
To Yield: 2.70%
Series: June 15, 1948
Due: June 15, 1964—1968

"Whereas, the Board of Education of Duchesne School District, Utah, has issued 3.50% School District Refunding Bonds to yield 2.70%, numbered 1—4 in the amount of $4,413.60 to mature in 1964; 6—16 in the amount of $12,193.50 to mature in 1965; 18—28 in the amount of $12,248.50 to mature in 1966; 30—41 in the amount of $13,419.60 to mature in 1967; and numbers 43—54 in the amount of $13,476.00 to mature in 1968, and

"Whereas, the Lauren W. Gibbs Company of Salt Lake City, Utah, agent for the Board of Education of Duchesne School District, has offered said bonds for sale to the State of Utah, and

"Whereas, the Attorney General of the State of Utah has examined the proceedings taken in the issuance of said bonds and has advised this office that said bonds were validly issued, and

"Whereas, there are certain uninvested funds of the State Insurance Fund available for investment, and

"Whereas, it appears to be to the best interests of the State to invest a portion of said funds in said bonds of the Board of Education of Duchesne School District.

. "Now, Therefore, Be It Resolved by the Department of Finance of the State of Utah that the Secretary of the Department of Finance be and he is hereby authorized and directed' to purchase said bonds in a total principal amount of $50,000.00 from the Lauren W. Gibbs Company. ·

"Be It Further Resolved that the Secretary of the Department of Finance be and he is hereby authorized and directed to draw his check on the Treasurer of the State of Utah against the funds of the State Insurance Fund in favor of the Lauren W. Gibbs Company in the amount of $55,861.37, representing the amount of principal, premium, and accrued interest on said bonds.

"In Witness Whereof, we have hereunto set our hands and caused to be affixed the seal of the Department of Finance of the State of Utah this 8th day of July, 1948. .

| | State of Utah Commission of Finance |
|---|---|
| "Attest: | |
| "s/Milton B. Taylor | s/Jerrold P. Beesley |
| "Executive Secretary | Chairman |
| "Approved, Board of Examiners: | s/Milton B. Taylor |
| "s/Herbert B. Maw | Commissioner |
| "Governor | |
| "s/Heber Bennion, Jr. | s/J. Fred Pingree |
| "Secretary of State | Commissioner." |
| "s/G. A. Giles | |
| "Attorney General | |

It will be observed from a reading of the municipal resolution that cognizance was taken of Section 82C—2—34, supra. The resolution ratifies and confirms a sale to Lauren W. Gibbs subject to the statutory option of the State of Utah. In view of the fact that this resolution was submitted to the Commission of Finance before the pur-

chase, the commissioners who participated in the transactions are charged with knowledge of its contents. The commissioners would, therefore, know that Gibbs was acting between the parties in some capacity, but the important question is whether his capacity was such as to make the dealings irregular and improper.

The resolution provides that Gibbs is to receive the premium, if any, as partial consideration *for services previously rendered to the municipality.* Neither party saw fit to produce evidence as to the nature, extent, or value of these services, so we are required to accept the resolution as it is worded. If we do this, then the transaction appears to be that Gibbs was employed by the municipality for certain legitimate purposes prior to the time the bonds were sold to the State Finance Commission and that he was entitled to be paid for the services rendered. If bona fide services were performed for the issuer by Gibbs and he offered the bonds to the State of Utah with the understanding that he was to be paid the amount of the premium, in partial or full satisfaction for his services, there would not be any illegality connected with the transaction. A municipality is free to employ legal counsel, investment counselors, or other parties well versed in bond transactions to advise it as to a method of procedure from the first requirement to the final sale, and for such services compensation can be paid. We assume that a commissioner can rely on the representations made by the city fathers so that if the members of the State Finance Commission relied on the resolution and believed that Gibbs had furnished prior services and was entitled to be paid, it matters not that his payment was determined by the amount of the premium. There is no showing that Gibbs would not be paid as much or even more had the Commission rejected the offer and the issue been sold elsewhere; nor is there any showing that had the commission made a counteroffer which excluded any payment for services, the

issuer would have been able to accept. Municipalities are bound by their contracts and these permitted Gibbs to sell elsewhere. We can hardly impute bad faith to public officials and hold that they would certify there was money due for services performed when such was not the case. Neither can we hold a commissioner incompetent because he does not go behind the certificate to detect bad faith.

It is intimated in the record that these transactions compel a holding that Gibbs and the Commission had a working agreement detrimental to the best interests of either the issuer or the state. If we could come to this conclusion, then cause would be established, but there are many missing links in the chain of evidence. By way of illustration, the testimony shows that this procedure had been in effect for at least eight years, and the departments have by statute been authorized to purchase bonds without limitations as to price for thirty years; the number of transactions involved over the eight-year period is not disclosed, but there is a statement that thirty-five investments of the State Land Board have been investigated (this is only one of a number of departments involved, and its investments were approved by the Board of Examiners) ; and the number of bonding houses who might have sold bonds to the State of Utah during this period is suggested but the number of transactions with each is not fixed. There is the following statement contained in the letter written to the Governor: "Further, it is only fair to say that these transactions did not involve a great majority of security investment houses in the State, but were limited to one or two houses which seem to specialize in small issues of municipals." It may be that the smaller municipalities had good reason to adopt this procedure and employ brokers who would handle and dispose of their bonds because the brokers were familiar with and had specialized in small issues. We have not been cited to any reason why municipalities should not employ specialists

on a commission basis and we are certain that payment on that basis is within the powers of the issuer. If it is contended that the cities and towns did not need the services of investment counselors who specialized in that field, the cases brought to this court for determination lead to a contrary conclusion. In any event, that is a decision which must be made by the issuer, not by a state commissioner.

It must be kept in mind that the statute places the burden of offering the original bond issues on the board or officers of the taxing districts and not on the State Finance Commission. There is, of course, the provision that the Commission, after receipt of an offer, if it does not care to accept, must either refuse it or notify the issuer of the terms and conditions on which it is willing to purchase. In all ten of these instances the offer was made as required, the commission elected to purchase, and so there was no necessity of further correspondence. It can be argued that had the commission rejected Gibbs' offer and made a counter-offer with the amount of the premium eliminated that the Commission could have saved the state or the taxing unit the amount of the premium. This begs the question as to whether there were sums due for services performed. Unless the officers of the cities have schemed with Gibbs to avoid the statute, and we are not inclined to indict so many public officials, there was money due him for services performed and the municipality was required to pay it whether the bonds were sold at a high or low figure, and if the Commission of Finance refused to purchase the bonds at the price offered the city was free to permit Gibbs to sell elsewhere. If he could obtain the same amount, or more, from private sources the issuer would not suffer any loss, only the state would lose. If the bonds were not placed on the open market at a figure equal to that submitted to the Commission of Finance, then the city would pay Gibbs less. He may have made a particularly beneficial agreement with the issuer, but the

commission could only refuse to buy the security; it could not dictate the terms of the contract between Gibbs and the taxing unit. It is a recorded fact that in no instance did the State Finance Commission purchase bonds which yielded less than 25/8 per cent interest and this takes into account the premium paid. It may well be that private investors would be willing to purchase tax-exempt securities with that yield at an even greater price than was paid by the Commission. At least, there is no evidence that sale on the open market would have brought less to the municipality and it is entirely possible that Gibbs, had he been permitted to make the sale on the open market, might have made more than he did by placing the bonds with the State Finance Commission. The official State records, Public Documents 1946-1948, contain the Biennial Report of the State Land Board and show that in 1948 the State Land Board recommended to the Governor that legal provisions be enacted to permit additional investments, as the lack of suitable bonds for investment made it impossible to keep funds invested at a suitable interest rate. It is not, therefore, unreasonable to conclude that a Commissioner might conscientiously and with good reason believe that under financial conditions then existing it was for the best interest of the State to purchase the bonds, even though there was an investment counselor in the picture who would earn a fee from the issuer.

We can rather summarily dispose of the second group of transactions. These involve those instances where the commission purchased direct from the issuer or waived its right to purchase. They were introduced in evidence to establish knowledge on the part of the commissioners that an investment counselor or broker need not be employed to deal with the Commission. There is no contention to the contrary. The most these transactions tend to prove is that so far as the records of the commission are concerned the issuer did not employ or contract to pay outside help

to issue and dispose of its bonds.

The third groupment concerns three exchange transactions. These are as follows:

| State Owned: | Traded For: |
|---|---|
| $26,000 worth of 4.75% South Sanpete School Bonds | $29,000 worth South Salt Lake Water bonds. 4.75% until South Sanpete bonds mature and 3.06% thereafter |
| Due: $10,000—7/15/51<br>10,000—7/15/52<br>6,000—7/15/53 | Due: $ 6,000—5/1/66<br>20,000—5/1/65<br>3,000—5/1/64 |

The state paid Gibbs $352.87 accrued interest and Gibbs paid State $308.75 accrued interest.

| $40,000 worth 5% Uintah School District Bonds | $45,000 worth South Salt Lake Water Bonds. 5% until maturity of Uintah School bonds and 2.78% thereafter. |
|---|---|
| Due: $10,000—5/1/52<br>10,000—5/1/53<br>10,000—5/1/54<br>10,000—5/1/55 | Due: May 1, 1968. |

State paid Gibbs $721.87 accrued interest and Gibbs paid State $916.66 accrued interest.

| $30,000 worth 4.75% South Sanpete School Bonds | $34,000 worth South Salt Lake Water Bonds. 4.75% until maturity of South Sanpete Bonds and 3.01% thereafter. |
|---|---|
| Due: $ 4,000—7/15/53<br>10,000—7/15/54<br>10,000—7/15/55<br>6,000—7/15/56 | Due: $14,000—5/1/66<br>20,000—5/1/67 |

State paid Gibbs $545.41 accrued interest and Gibbs paid State $356.25 accrued interest.

Emphasis is placed on the fact that these bonds were part of an issue offered to the State of Utah by the Edward L. Burton Company on the 24th day of April, 1948, which was waived, and that they were subsequently obtained when offered by Gibbs on this exchange. Again we are faced with a lack of evidence necessary to show this part of the transaction smacked of partiality. The record shows the bonds later accepted were part of an issue

of $250,000 offered by the Burton Company. However, the record is silent as to the terms of the original offer, the due date, the premium to be paid, the interest and yield on many of the bonds, whether it would be good business to invest that amount of money in one issue, and whether Burton would sell only a portion of the issue. We cannot hold the refusal to purchase was to assist Gibbs without some evidentiary basis in the record.

The trading of these bonds would appear to be the transactions which should be most closely scrutinized. Ordinarily, State departments should not be involved in trafficking in bonds, although the commissioners are vested with authority to sell or dispose of the securities. But this reservation should not go to the point where trades beneficial to the state should be prohibited. The present chairman of the commission concluded that the state lost money in these transactions, but the evidence is far from furnishing a sound foundation for the conclusion. (We use the first transaction as illustrative by him.) The resolution shows an exchange of $26,000 worth of South Sanpete School bonds for $29,000 worth of South Salt Lake Water bonds. On the face of the transaction it would appear that the state obtained $3,000 more in face value of bonds than it traded. According to the evidence, this does not take into account the fact that there was $2,000 of unamortized premiums which had been paid by the state on the South Sanpete School bonds. If this amount is taken into account, the state exchanged bonds worth $28,000 for bonds worth $29,000. While this would show a less spread in the value of the two issues, the more premium the state paid on the South Sanpete Bonds the less would be the yield realized. We do not set forth in detail the computations made to establish the difference in interest rate, and we assume the accuracy as given. This does not, however, entirely answer the question of loss to the state. The other two trades are not analyzed. The

three issues were all part of one exchange transaction in which the state received $108,000 face value in bonds for $96,000 face value. The evidence does not furnish us with the amount of the unamortized premium on the other two issues so we have no way of telling what the true spread in value may have been. There are, however, other elements entering into investment transactions which might influence the judgment of a commissioner. It should be observed that the $96,000 worth of bonds traded were due in the years 1951 to 1956, in varying amounts. The bonds obtained were not due until the years 1964 to 1968. It is conceivable that by adopting a long range view and estimating the future of the bond market, as it then existed, the commissioners could conscientiously believe it would be better to invest the state money for the longer period of time at a definite and known rate of interest than it would be to hold the early maturing bonds and gamble on the yield that might be obtained by new investments three to four years later. There is a possible conclusion that the state lost money on the exchange because funds were available with which to purchase the issues without trading bonds that were then owned. However, the use of that money may involve a matter of judgment as to what reserve should be maintained in the accounts and the advisability of holding back certain sums for other or better investments. A commissioner is entitled to use a certain amount of judgment and, whether it was used wisely or unwisely, must be gauged by all of the facts considered by him at that time and not by those available at a subsequent date. As will later be pointed out, to hold that this transaction was contrary to the best interests of the state would be weighing the judgment of one of the new commissioners against the judgment of three prior commissioners and the members of the State Board of Examiners, namely, the former Governor, Secretary of State, and the former Attorney General, without fully and fairly know-

ing the reasons which prompted the latter officials to agree to the trade. To conclude that they were all agreeable to sacrificing the welfare of the state to aid Gibbs is not deducible from the record.

The last item deals with communications between the commission and the town of Orderville. Without going into a lengthy discussion on the merits of this contention, we must consider the showing made in the record. There is no showing that the commission refused to deal with the town. The chairman of the committee notified the town that Gibbs had made an offer and suggested that he be contacted and arrangements made to see the commissioners if the town did not want Gibbs to handle the offer. The town answered that further information had been received from Gibbs and that he was to represent them as stated in his contract. Assuming, but not deciding, that when the Finance Commission received the communication from the town relative to the purchase of the bonds, some action should have been taken by the commission to have the town by-pass the broker, there is no evidence to show that Taylor knew or could be charged with knowledge that the letter had been received or answered. The letter to the town was dictated and signed by the chairman of the Commission and is in no way connected with plaintiff. It would be a harsh rule of law to charge one commissioner with knowledge of the contents of all letters written by other commissioners. Until and unless it was shown that Taylor knew of the communications, we cannot hold him responsible for their contents, even were we to assume that this isolated transaction would show incompetency.

Laying aside all personalities involved in this litigation, we are faced with a situation where taxing units have for thirty years been required to give the state the first right to purchase securities. Over this period of time, the various state departments have purchased bonds and many purchases have been made through

investment brokers or with them being paid for their services by the issuer. The statute appears to be a mandate requiring the issuers to make their offerings available to the State first and not to place a burden on the various departments and commissions to meddle in the financial affairs of the municipalities. In a great many of these transactions over the long period involved, governors, secretaries of state, attorney generals and members of the commission and boards have dealt with taxing units in a similar way. The plaintiff in this instance was appointed a commissioner on the 18th day of March, 1948, and had held office for the short period of 8½ months before the change in administration. He was placed on a commission where a pattern was fully developed and where a newly appointed commissioner might reasonably rely on the judgment of men who had been carrying on the business of the state for many years. Fraud, dishonesty or a plain violation of a statutory provision are not involved, and it appears arbitrary and unreasonable to hold that a commissioner who had held office for such a short period of time should be charged with incompetency merely because he did not protest a practice which for many years had been thought to be for the best interests of the state but which is now condemned by the present commission. We believe that before casting a shadow on a man's character and his capacity to hold public office, a showing of unfitness is required. Rare judgment is not required, even if it could be obtained. In every change of administration, incoming commissioners can search the records of their predecessors, go through them with a fine-tooth comb and perhaps scratch out something to suggest that all was not well with those who preceded them. We believe removal from a position of honor and trust for cause is a harsh remedy that should be limited to cases where the evidence reasonably establishes that the office-holder failed to meet the ordinary standards of competency and effi-

ciency. While we are in accord with the Governor's desires to require honest and efficient operation of all state departments, we are unable to find facts in this record to sustain his conclusion that the plaintiff should be removed for cause.

The judgment is affirmed.

WADE, McDONOUGH and CROCKETT, JJ., concur.

WOLFE, Chief Justice.

I concur.

I agree that Mr. Taylor, having accepted the benefit of the trial court's finding on the question of cause which was based largely, if not altogether, on the proceedings which took place in the Governor's office on January 26, 1950, and which proceedings were certified to the court, is not now in position to assert that those proceedings were unauthorized. I can see some force in the position Taylor took on January 26, 1950, the day the hearing was held. Naturally, he might not want to submit to a hearing ostensibly to determine whether there was cause to discharge him when he had already been discharged, if the discharge was to be considered to be in effect from January 3rd to January 20th. That would be discharging a person and then holding a hearing to justify the discharge. But as things turned out, Taylor must be considered as having ratified the hearing of January 26th and adopted it as part of the proceedings held to determine whether he would be discharged—a nunc pro tunc idea. It is for this reason that I concur with that part of the opinion which holds that as far as Taylor is concerned the proceedings of January 26th must be considered as proper before the court even though he objected to them as invalid as a basis for the Governor's action of January 3, 1950.

I reserve from my concurrence the statement that reads:

"We believe the best rule to be that if there is any evidence of a legal and substantial basis reasonably tending to support the Governor's findings, then he has not been arbitrary and his decision should be affirmed." I am not reserving that statement from my concurrence because I think it wrong. I do not think it necessary to the decision and wish to express no opinion regarding such a test. It expresses the usual rule of judicial action in the case of administrative bodies or agencies and may be applicable in cases of measuring the action of the Governor based on cause. Taken in connection with that phase of the opinion which treats of the standards of efficiency to which state officers may be held, there may be some doubt about it. Certainly, such officers should be held to a high standard, but situations may arise where the standard is held high for some officers and relaxed as to others. The question of whether there was an absence of good faith on the part of the removing officer may enter the picture. In cases where there was not gross or marked inefficiency an alleged lack of the highest standards, or some special instances of conduct claimed to fall short of the removing officer's standard might be used to oust an officer in order to supplant him for reasons, ostensibly of inefficiency, but actually for ulterior motives. Perhaps, if there is evidence which reasonably tends to support the removing officer's finding on the question of efficiency, we should not go back of it. "Reasonably" is an accordion word and may take care of the issue of good faith or the lack of it in close cases, but I do not believe it necessary to consider those questions in this case and hence I withhold my concurrence to this phase.

I think the procedure laid down by the opinion when "cause" is required is correct and should be helpful. I further think the analysis of the evidence of the transactions concerning the resolutions of the Board regarding

the dealings in municipal bond issues signed by Taylor and the conclusions reached therein to be strictly judicial and unassailable.