BODMER et al. v. POLICE MUT. AID ASS'N.

No. 5914. Decided April 28, 1938. (78 P. 2d 640.)

Rehearing denied July 6, 1938.

*Fisher Harris,* City Atty., and *E. R. Christensen* and *Gerald Irvine,* Asst. City Attys., all of Salt Lake City, and *John D. Rice,* Deputy Atty. Gen., for appellant.

*Willard Hanson* and *Stewart M. Hanson,* both of Salt Lake City, for respondents.

WOLFE, Justice.

Appeal from a judgment giving plaintiffs, as heirs of John A. Morgan, $1,500 as a benefit from the Police Mutual Aid Association. John A. Morgan was an active and regular police officer of the Salt Lake City Police Department, at least up to and including March 3, 1935. This case is concerned with matters and transactions after that date. He was also a member of the Police Mutual Aid Association, with his dues paid up to and including March, 1935.

The constitution of the association (article XV) provides that upon the death of a member in good standing there shall be paid to certain persons from the general fund $1,500. The constitution also provides (article XIII) that members of the association shall continue as such "so long as they remain in regular active service in the Police and

Prison Department and pay their dues," etc., as required. John A. Morgan died on March 18, 1935. The question for the lower court was whether on said date he was a member of the association in good standing. The trial court found that he was, from which finding and judgment of $1,500 in favor of his children this appeal is taken. The solution of this question depends on the answer to the subsidiary question of whether he was before his death discharged as a police officer.

The facts leading up to and relating to the alleged discharge are as follows: On March 4, 1935, Beckstead, another police officer, found Morgan in a taxicab. He was taken before the then chief of police, W. L. Payne. Payne said to him, "John, you are through from now on." Payne testified that at that time he was to a "point of inebriation that he couldn't say anything"; that he just cried and used profanity; that some of the officers interrogated him in Payne's presence; that he was in his presence on that day possibly five minutes; that after taking his badge and keys he ordered him locked up in the jail, where he remained all night. On the 5th of March, Payne gave to the plaintiff Mrs. Bodmer, daughter of Morgan, in the presence of an attorney who was the brother of Morgan, two letters in envelopes. One of these was a letter written early on March 4th, suspending Morgan for thirty days, after he, Payne, had been informed that Morgan had been drinking. It was Payne's intention to cause that letter to be delivered to Morgan, but before he had opportunity to do so he heard of a shooting affair at the Semloh Hotel at which Morgan was present and sent Beckstead to bring him in. The second letter of dismissal was written on March 4th after Morgan had come before him as above related. These two letters were given to the daughter of the deceased, Mrs. Bodmer, on the morning of the 5th. Mrs. Bodmer testified that when Payne handed her these two letters he said, "Here, I will give you these papers. I don't want John to see them. He is sick. He can't understand what it is about, anyway."

She states she never showed them to her father and that it was only after his death that she read them. After the letters were given to Mrs. Bodmer, she took her father away. He did no work after that time. He was under the physician's care but was able to visit at the home of his daughter until the Friday before he died. He died on March 18th. After Payne wrote the last letter of March 4th, he also dictated and sent a letter to the city commission on March 5th stating that Morgan had been dismissed from the Salt Lake City Police Department for conduct unbecoming an officer. On the same day the city made an order concurring in the action of the chief of police. A letter written to Mr. Morgan by the city recorder to the effect that Morgan had been dismissed was delivered to his brother, N. G. Morgan.

Two main questions present themselves for solution: (1) Does the statute require notice and hearing before a policeman may be discharged by the chief of police? (2) If not, was there a discharge of Morgan before his death?

We think the first question must be answered in the negative. It is true generally that, where an officer cannot be dismissed except for cause or where he is appointed for a definite term, there must be notice and a hearing before he can be removed. This is the case even though the statute does not require it. It, of course, is the case where the statute does require notice and hearing before discharge. Conversely, it is true that where the scheme of the statute apparently permits discharge, but allows an appeal from such discharge to a commission, that the discharge may be made without previous notice and hearing. It is then a complete discharge, subject to review. It is within the power of the Legislature to determine whether the discharge shall be conditioned on notice and hearing or whether it may be completed, subject to a review by a commission where the officer may demand his hearing. *Sheriff* v. *Board of Commissioners of Salt Lake County*, 71 Utah 593, 596, 268 P. 783; *State ex rel. Nagle* v.

*Sullivan,* 98 Mont. 425, 438, 40 P. 2d 995, 99 A. L. R. 321; *Bryan* v. *Landis,* 106 Fla. 19, 142 So. 650, 652; *State ex rel. Early* v. *Wunderlich,* 144 Minn. 368, 371, 175 N. W. 677; *Field* v. *Commonwealth,* 32 Pa. 478, 481; 99 A. L. R. 336, 340, and numerous cases there cited; McQuillin on Municipal Corporations, 2d Ed., § 578; 22 R. C. L. 561.

Our statutes are of the type which permit discharge without notice or hearing but give the discharged officer the right to have the discharge reviewed to see if it was based on misconduct, incompetency, or failure to perform his duties or to observe properly the rules of the department. Section 15-9-21, R. S. Utah 1933, reads as follows:

"All persons in the classified civil service may be removed from office or employment by the head of the department for misconduct, incompetency or failure to perform his duties or failure to observe properly the rules of the department, but subject to appeal by the aggrieved party to the civil service commission. Any person discharged may within five days from the issuing by the head of the department of the order discharging him appeal therefrom to the civil service commission, which shall fully hear and determine the matter. The discharged person shall be entitled to appear in person and to have counsel and a public hearing. The finding and decision of the civil service commission upon such hearing shall be certified to the head of the department from whose order the appeal is taken, and shall be final, and shall forthwith be enforced and followed by him."

This language reveals first that a person in the classified civil service may be removed for certain causes subject to an appeal. It then goes on to say any "discharged" person may within five days, etc., recognizing that the status of a discharged person has already come into existence. The "discharged" person is entitled to appear in person, have counsel and a public hearing. The statute did not want to cumber the procedure of discharge by a notice and hearing and then permit the discharged person to have another hearing. The idea was that the chief should be able to quickly act and not be required to go through a prolonged

procedure in order to get rid of a man. As far as he was concerned, he could act on his own knowledge and judgment. The discharged man was amply protected by appeal to the commission.

The cases cited by respondents support only the general principle that discharge of a public officer for cause must be attended by a hearing where the statute specifically so requires or is silent. None of the cases are directed to the question whether the hearing is sufficient if accorded after the discharge. In fact, one of the respondents' cases, namely, *Bannerman* v. *Boyle,* 160 Cal. 197, 116 P. 732, 735, makes the distinction between the type of statute which simply provides for removal for cause and one which provides for removal with notice of and hearing after removal, recognizing that there could be a removal without notice or hearing in such case. It cites the case of *In re Carter,* 141 Cal. 316, 74 P. 997, distinguishing the latter from the Boyle Case, in that the charter of San Diego provided that the mayor could "remove for cause" but added that "in case of such removal" he should give written notice thereof, "stating the cause, to the person removed." This language, the court holds, recognized that the person notified was in a "removed" state just as under our statute the person discharged with right of appeal is recognized as being in a discharged state. See *Garvin* v. *Chambers,* 195 Cal. 212, 232 P. 696. In the Carter Case, supra, it was held that, since the mayor in removing the fire commissioner was not exercising a judicial function—notice and hearing not being preliminary to removal—certiorari would not lie. In that case a discharge by the chief of police could not be reviewed by certiorari since he exercised an administrative and not a judicial function.

In *State ex rel. Lennon* v. *Kellogg,* 119 Wash. 584, 205 P. 843, it was held that the charter of the city of Seattle and rules of the Civil Service Commission provide an orderly procedure by which a discharged employee may have the cause for his discharge investigated. That is exactly what

section 15-9-21 accomplishes. *State ex rel. Davis* v. *City of Seattle,* 125 Wash. 660, 216 P. 858; *Bryan* v. *Landis,* supra.

The second question is as to whether there was a discharge. There is a discharge when there is an intention to discharge evidenced by acts which unequivocally show the intent. In this case the chief of police told Morgan that "he was through with the department." His badge and keys were taken from him and his gun not returned to him. He was placed in the jail. Next day a letter was given to the daughter which stated that he was discharged, and a letter was sent to the commission stating he had been discharged. His name was taken from the pay roll and a check for $7.45 for three days in March made out. We think the evidence is uncontradicted that the chief intended to discharge Morgan and that he evidenced such intention by acts unequivocally registering such intention. *O'Brien* v. *Straight Filament Lamp Co.,* 86 N. J. L. 352, 354, 91 A. 100; *Percival* v. *National Drama Corporation,* 181 Cal. 631, 637, 185 P. 972.

Must the discharge be communicated to the employee to be effective? Certainly, in private as well as public employment ordinarily the only way an employee might know he was discharged would be to have it communicated to him in some form. It is not necessary in order for the discharge to be effective that it be communicated to the employee and understood or realized by him at the time of the discharge. In some cases it might be impossible to do so. He might leave for parts unknown or he might, as it is claimed in this case, be incapacitated to appreciate such communication and have become so by his own misconduct. At all events it would seem that, if he became incompetent by his own misconduct, it would hardly be necessary to have a guardian appointed to inform him. In this case the testimony of Beckstead is that in the taxicab where he was first discovered on the morning of March 4th he stated that it was useless to take him before the chief; that he knew he was through. Beckstead testified that he an-

swered certain questions intelligently put to him by the chief at the time he was told by the former "that he was through." Further, that he believed Morgan understood the chief's questions. The chief himself testified that, when told that he was through, Morgan cried. On cross-examination he testified that he was "so highly inebriated that he didn't seem to realize what was happening" and that he was "out of his mind" and did not know what he was doing or understand what was being said to him. We have, therefore, some evidence to support the finding of the court, "that said John A. Morgan was in such mental condition as to be unable to understand or realize why he was brought before said Chief of Police."

But we think there is no evidence to sustain finding No. 11, reading as follows:

"At no time was the said John A. Morgan advised or informed or had any knowledge of any action or proceeding taken or suggested by the Chief of Police or by any board or person, concerning or pertaining to a pretended or any suspension or dismissal of him from the police service of Salt Lake City."

There is evidence to support the finding that contents of the two letters were never communicated to him. Mrs. Bodmer testified that she had not opened them before his death. N. G. Morgan testified he had not told his brother about the letter which was served upon him by the city recorder. If N. G. Morgan did not inform his brother concerning the letter, it seems probable that he did not do so because he judged that his brother must know or realize that he was discharged and giving him the letter would be a useless act. Mrs. Bodmer testified that she kept the newspapers from him and that he only had a quarter in his pocket and she took that away from him so that he could not buy one. The newspapers were evidently heralding the discharge of Morgan.

It is quite possible that, if Mrs. Bodmer did not look into the envelopes, perhaps she refrained from doing so because

it is quite likely she guessed the purport of their contents. Likewise, while it is not improbable that she might have done everything she could to defend her father against newspaper and other accounts which would cause him distress, it is quite improbable that he did not know of the real situation. As before stated, he sensed that the only thing that could happen to him was that he would be discharged, and, giving him the benefit of the supposition that his condition was such that he did not comprehend Payne's statements, at least he must have surmised why he was called before the chief. But with all this, and considering that the witnesses for the plaintiffs were interested witnesses, we must accept the court's finding that the letters delivered by Chief Payne to Mrs. Bodmer and the letter delivered to N. G. Morgan by the recorder were never delivered to John A. Morgan and that he had no knowledge of them.

But we cannot accept the court's finding on the fact that John A. Morgan never knew he had been discharged. While he may not have known of the specific letters discharging him, the evidence is uncontradicted that he realized that he had been discharged. James H. Bilton testified that he had talked to Morgan on the street about a week or so after he had been arrested by Beckstead. Morgan told him that if he (Morgan) was not reinstated he would make trouble. If he spoke of reinstatement, he must have known that his state was one of being discharged. *Ryan* v. *Mayor of City of New York,* 154 N. Y. 328, 331, 48 N. E. 512. It is incredible that when he expected to be discharged on the day of his arrest, when he became comparatively normal and went about and did not go to the police department to find out about his status, visited his daughter, who would in all probability at least mention the letters, that he did not know that he had been discharged. Common sense should not stop at the threshold of the courtroom. We think there is ample evidence uncontradicted that even if Morgan was never apprised of the

letters or their contents and did not on March 4th realize that he had been discharged that later he did realize or know that he had been discharged. We are not now called upon to determine when his five days in which to appeal to the Civil Service Board would begin to run. It may well be that for that purpose an order of discharge must be made (one was made on the afternoon of March 4th) and be served on him or least every effort be made to bring it to his attention. *McDonald* v. *City of Dallas,* Tex. Civ. App., 69 S. W. 2d 175. In *Curtin* v. *Board of Police Commissioners,* 74 Cal. App. 77, 239 P. 355, it was held that a policeman quitting the department and leaving the city was not entitled to personal service. We think the same rule might apply when a policeman incapacitated himself to such a point that notice could not be served upon him. Then constructive notice in the form of notifying his immediate family should be sufficient.

In the instant case one fact stands out prominently. If Morgan, by his own acts, had so incapacitated himself that he was unable to understand that he was being discharged, he can hardly complain that he did not realize it. His conduct would be such as to estop him from taking advantage of that fact. There seems to be no doubt that he was inebriated. Certainly, the chief of police should know inebriation when he sees it. If such were not the case, an employee might keep himself in a condition which would enable him to assert that he could not entertain a communication of discharge. If his conduct should result in a prolonged sickness or insanity and he could not be discharged until he was able to reasonably appreciate the fact, his pay would have to continue regardless. Such a state of affairs would be intolerable. The matter of whether a discharge has actually taken place and the matter of when his right to appeal begins we think are different questions. The latter is not involved. We think Morgan was effectively discharged as far as severing his connection with the association is concerned.

460

The cause is reversed, with instructions to grant a new trial. Costs are granted to the appellant.

FOLLAND, C. J., and HANSON and MOFFAT, JJ., concur.

LARSON, Justice.
I dissent.