FILED
United States Court of Appeals
Tenth Circuit

April 1, 2016

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

SHAUNA NEBEKER,

    Plaintiff - Appellant,

v.

NATIONAL AUTO PLAZA; KOLBY
HANSEN,

    Defendants - Appellees.

No. 15-4035
(D.C. No. 2:13-CV-00885-BSJ)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **BALDOCK**, and **MORITZ**, Circuit Judges.
_____

    Shauna Nebeker worked directly under Kolby Hansen at National Auto Plaza ("NAP"), a car dealership, for a little over five years. The relationship between Hansen and Nebeker started to go sour when Nebeker's health conditions flared up and she began coming in late, leaving early, and missing whole days, sometimes for doctor's appointments associated with those health conditions. Things came to a head in February 2012 when Hansen called Nebeker into his office, said, "This isn't working for me," and berated her for poor attendance. At the end of the meeting, Nebeker said, "I guess this isn't working for you," and left his office. She then sued

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Hansen and NAP for wrongful termination in violation of Utah public policy, interference with her rights under the Family and Medical Leave Act ("FMLA"), and discrimination under the Americans with Disabilities Act ("ADA"). The district court granted Defendants' motion for summary judgment on all three claims. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.     Factual background

The following facts are either undisputed or taken in the light most favorable to Nebeker. Nebeker worked for NAP for over five years from December 2006 until February 2012. As the office manager and controller, she worked directly under Hansen, NAP's owner. Nebeker's role involved, among other things, supervising and training employees; resolving daily issues; authorizing and issuing checks to third parties; controlling correspondence; monitoring financial transactions; authorizing and receiving payments; and liaising with other agencies, organizations, and groups. Only she and Hansen were authorized to sign checks on NAP's behalf.

During her employment, Nebeker had several serious health conditions, including migraines, Temporomandibular Joint Disorder ("TMJ"), depression, anxiety, and problems with her immune system, including adrenal gland, hormonal, and thyroid problems. At one point, she was hospitalized for her anxiety because she thought she was having a heart attack. On another occasion, she had surgery to remove an ovary. She discussed her health problems with Hansen to make him aware of why she was missing work, and specifically informed him of her migraines, TMJ, and anxiety. Most times that Nebeker missed work, was late, or left early, she

2

informed Hansen by calling or texting him. On other occasions she told Stephanie Gowers, another NAP employee who worked directly under Nebeker, or called NAP's receptionist. Nebeker often stayed late and worked weekends to compensate for some of her absences, but she never asked Hansen for FMLA leave or an accommodation because she "didn't feel that [she] could" and believed there was "no point in asking." Hansen repeatedly told her, "I need you to be here," and, "You need to be here; you need to be here," to which she would respond, "I'm trying, I'm doing my best." Although Hansen believed Nebeker when she told him she was sick, he said her "tardiness got repetitive." He asked several employees to track Nebeker's attendance and berated her in front of others for her absences. From January 3 to February 9, 2012, Hansen's record showed that Nebeker was late to work three times without explanation, left work early three times without explanation (once noting that she "didn't sign a check"), and missed work entirely three times.[1] On one of the days she missed, she called in sick and promised to make it up on Saturday. On another day, she stated she had a migraine.

On February 9, 2012, Nebeker arrived at work between 9:00 and 9:30 a.m. She spent the day composing an email to Hansen regarding a practice she thought violated the law: writing checks to "cash" to pay Kory Hansen, Hansen's brother, for

---

[1] Nebeker disputes that she arrived late on one of the dates Hansen recorded. She also included in the record a doctor's note to show the reason she left work early one day. Although the note says only "outpatient visit" and is itself insufficiently connected to any serious health conditions, Nebeker maintained in her deposition that she informed someone at NAP the reasons for missing work.

3

the work he did as an independent contractor for NAP.[2]  Shortly after Nebeker sent the email at 4:42 p.m., Hansen called her into his office and said, "This isn't working for me."  He reviewed notes from his phone regarding Nebeker's attendance and kept getting louder and louder as he read the times Nebeker had been absent from or tardy for work during the previous weeks.  He accused her of being a "no-show, no call," and when Nebeker tried to dispute that allegation, he told her to "shut up" and "listen."  After reviewing her attendance, he asked, "What do you have to say?"  Nebeker responded, "I guess this isn't working for you," and she left the room.  She went to her office, called a friend and said she had just been fired, and began boxing up her personal belongings.  Hansen sent a sales manager to watch Nebeker box up her belongings to make sure she did not steal anything.  Gowers came to Nebeker's office after Hansen told her that Nebeker quit and helped Nebeker box up her belongings.  Nebeker later returned to Hansen's office to make clear what he said, but he had already left.  On February 21, Nebeker emailed Hansen and stated, "I, in no way, quit or resigned my position at NAP."  After recounting their meeting, she said, "I naturally assumed you were letting me go, so at that point, I walked out of your office and you didn't stop me."  Hansen did not respond to her email.

## II.    Legal standards

We review the district court's grant of summary judgment *de novo* "to determine whether any genuine issue of material fact exists, viewing all evidence and any

---

[2] We refer to non-party Kory Hansen by his first and last names and to Defendant Kolby Hansen as "Hansen."

4

reasonable inferences that might be drawn therefrom in the light most favorable to the non-moving party." *Croy v. Cobe Labs., Inc.*, 345 F.3d 1199, 1201 (10th Cir. 2003); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and "[a]n issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

We review the district court's interpretation and determination of state law *de novo*. *ClearOne Commc'ns, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 494 F.3d 1238, 1243 (10th Cir. 2007). "Where the state's highest court has not addressed the issue presented, the federal court must determine what decision the state court would make if faced with the same facts and issue." *Id.*

## III. Wrongful termination in violation of Utah public policy

To make out a prima facie case of wrongful discharge in violation of public policy under Utah law, "an employee must show (i) that his employer terminated him; (ii) that a clear and substantial public policy existed; (iii) that the employee's conduct brought the policy into play; and (iv) that the discharge and the conduct bringing the policy into play are causally connected." *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 404 (Utah 1998) (footnote omitted). After the employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate reason for discharging the employee. *Id.* at 405. The burden then shifts

5

back to the employee to prove that engaging in the protected conduct was a "substantial factor" in the employer's motivation to terminate the employee. *Id.*

This case turns on the first factor: whether Hansen terminated Nebeker's employment. First, the parties disagree as to the appropriate standard for determining whether a termination occurred. Defendants point to *Bodmer v. Police Mutual Aid Ass'n*, 78 P.2d 640, 643 (Utah 1938), which states: "There is a discharge when there is an intention to discharge evidenced by acts which unequivocally show the intent." Nebeker, on the other hand, points to *Taylor v. Tulsa Tribune Co.*, 136 F.2d 981 (10th Cir. 1943), a Tenth Circuit case interpreting Oklahoma law which cites *Bodmer*. The standard from *Taylor* states: "[A]ny acts or words which show a clear intention on the part of the employer to dispense with the services of the employee, and which are equivalent to a declaration that the services will no longer be required or accepted, are sufficient to effect a discharge." 136 F.2d at 983. The district court did not decide which standard was correct but concluded Nebeker's claim failed under either standard. Because Nebeker's claim for wrongful discharge is a Utah state claim, our task is to interpret and apply Utah law. Although the Utah Supreme Court decided *Bodmer* in 1938 and has not cited its definition of discharge since, the parties have not pointed to a more current definition from the Utah Supreme Court, nor could we find one. We see no reason to depart from the Utah Supreme Court's formulation in *Bodmer*. "[W]e must apply the most recent statement of state law by the state's highest court." *Wood v. Eli Lilly & Co.*, 38 F.3d 510, 513 (10th Cir. 1994).

6

Nebeker contends a genuine issue of material fact exists regarding whether she was terminated. We must credit her evidence as the non-movant and draw all justifiable inferences in her favor, but even so, we do not see a genuine issue here—that is, a reasonable jury could not, on this evidence, conclude Nebeker was terminated. Why? Because Hansen's acts do not "*unequivocally* show" his intent to discharge her. *Bodmer*, 78 P.2d at 643 (emphasis added). He called her into his office; said that "[t]his isn't working for me"; reviewed her attendance from the previous weeks, getting louder as he went down the list; accused her of being a "no-show, no-call"; told her to "shut up" and "listen"; and when he concluded his record of her attendance, asked, "What do you have to say?" Nebeker contends the phrase "this isn't working for me" is often used in break-ups, but that phrase may also be used in a performance review to encourage better work, which would explain why Hansen asked for Nebeker's response at the end. Simply getting louder as he explained his frustrations and telling her not to interrupt likewise falls short, particularly when he gave her a chance to explain after he finished. A reasonable juror could not conclude that Hansen's conduct *unequivocally* showed his intent to fire her. Because we conclude there is no genuine issue of material fact that Nebeker was terminated, we affirm the district court's grant of summary judgment on Nebeker's wrongful discharge claim.

## IV.  FMLA

The FMLA entitles qualifying employees "to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."

7

29 U.S.C. § 2612(a)(1)(D). An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the FMLA. 29 U.S.C. § 2615(a)(1). To prevail on an interference claim, an employee must demonstrate (1) she was entitled to FMLA leave; (2) some adverse action by the employer interfered with her right to take FMLA leave; and (3) the employer's action was related to the exercise or attempted exercise of her FMLA rights. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1180 (10th Cir. 2006). Employers who violate § 2615 are "liable to any eligible employee affected" for damages and "for such equitable relief as may be appropriate." 29 U.S.C. § 2617(a)(1). An employee may recover only if she shows the employer's violation prejudiced her. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002).

The district court granted summary judgment on Nebeker's FMLA claim because she failed to provide notice to Defendants that she had a serious health condition that could warrant FMLA leave. The district court additionally noted in a footnote that Nebeker continued to receive a regular salary and her pay was never docked, which we interpret to be a conclusion that Nebeker was not prejudiced by any interference with her FMLA rights. We believe a genuine issue of material fact may exist as to whether Defendants had notice that Nebeker might qualify for FMLA benefits. *See Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 997 & n.11 (10th Cir. 2001) (explaining that "[i]f the employer is on notice that the employee might qualify for FMLA benefits, the employer has a duty to notify the employee that FMLA coverage may apply," and the employer's failure to personally notify an employee of

8

his FMLA rights in that situation may constitute an actionable interference with those rights). Instead, we affirm on the alternate ground that Nebeker was not prejudiced by any interference with her FMLA rights.

We may affirm the district court "on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented to us on appeal." *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011). Defendants argue Nebeker failed to show she was prejudiced as a result of Defendants' interference with her FMLA rights.[3] We agree. As the Supreme Court explained, even when an employee establishes under 29 U.S.C. § 2615 that an employer interfered with, restrained, or denied her exercise of FMLA rights, § 2617 does not provide relief

> unless the employee has been prejudiced by the violation: The employer is liable only for compensation and benefits lost "by reason of the violation," § 2617(a)(1)(A)(i)(I), for other monetary losses sustained "as a direct result of the violation," § 2617(a)(1)(A)(i)(II), and for "appropriate" equitable relief, including employment, reinstatement, and promotion, § 2617(a)(1)(B). The remedy is tailored to the harm suffered.

*Ragsdale*, 535 U.S. at 89.

Nebeker identifies three adverse actions she contends interfered with her FMLA rights: (1) termination; (2) failing to specifically inform her that FMLA coverage may

---

[3] Defendants raised this argument for the first time in their Reply Memorandum in Support of Summary Judgment before the district court and then again in their brief before this Court. Although they did not initially move for summary judgment on a lack of prejudice, Nebeker nonetheless had sufficient notice and opportunity to respond to this ground but failed to do so. *See Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1192 (10th Cir. 2006) (noting that the non-movant had "plenty of opportunity to seek leave of the court to file a surreply but never attempted to do so").

apply; (3) discouraging her from taking leave by essentially creating an environment of hostility towards her taking leave.  Because we have concluded that no genuine issue of material fact exists as to whether Nebeker was terminated, we consider only whether she has shown prejudice under her latter two theories.[4]  She has not.  Under both theories, Nebeker essentially argues Defendants' conduct prevented her from asking for and taking the FMLA leave to which she was entitled.  But the FMLA guarantees twelve weeks of *unpaid* leave.  *See Metzler*, 464 F.3d at 1180 ("The FMLA guarantees the substantive rights of up to twelve weeks of *unpaid* leave for eligible employees of covered employers for serious health conditions and reinstatement to the former position or an equivalent one upon return from that leave." (emphasis added)).  As the district court pointed out, Nebeker received a regular salary and her pay was never docked, even when she took leave.  Nebeker also did not submit or point to evidence of monetary losses she sustained

---

[4] The district court did not consider whether Defendants terminated Nebeker for her FMLA claim, but briefly noted while analyzing her ADA claim that its previous conclusion—that Nebeker was not terminated under Utah law—applied equally to its ADA analysis.  Neither party seems to have considered, before the district court or here, that the FMLA and ADA might not employ the Utah state law definition of termination.  When a party intentionally relinquishes or abandons an argument in the district court, "we usually deem it waived and refuse to consider it." *Richison*, 634 F.3d at 1127.  When a party fails to raise a theory before the district court out of neglect, we usually hold that the theory is forfeited.  We will "reverse a district court's judgment on the basis of a forfeited theory only if failing to do so would entrench a plainly erroneous result." *Id.* at 1128; *see McKissick v. Yuen*, 618 F.3d 1177, 1189 (10th Cir. 2010) (noting that "even if [a party's] arguments were merely forfeited before the *district court*, [the] failure to explain . . . how they survive the plain error standard waives the arguments in *this* court").  Because neither party has argued that a different definition of termination should apply, we will apply our previous conclusion regarding termination under Utah law to our FMLA and ADA analyses.

10

as a result of the alleged violations. *See* 29 U.S.C. § 2617(a)(1)(A)(i)(II) (allowing damages "in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee" equal to the amount of "any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks . . . of wages or salary for the employee"). Finally, Nebeker does not explain what equitable relief might be appropriate now that she is no longer employed at NAP; she does not seek reinstatement and such an equitable remedy would not be appropriate as she was not terminated. Because Nebeker fails to show she was prejudiced by Defendants' interference with her FMLA rights, we affirm the district court's grant of summary judgment on Nebeker's FMLA interference claim.

## V.    ADA

The ADA provides in part that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee." *Id.* § 12112(b)(5)(A). To establish a prima facie case of discrimination under the ADA, Nebeker must demonstrate (1) she is disabled within the meaning of the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of her job; and (3) she was discriminated against because of her disability. *Tate*, 268 F.3d at 992. Like the district court, we turn directly to the third element.

11

Nebeker argues Defendants discriminated against her by terminating her employment and failing to reasonably accommodate her. We reiterate that no genuine issue of material fact exists over whether Nebeker was terminated. We therefore focus on whether Defendants failed to reasonably accommodate her. The district court concluded Defendants did not fail to accommodate Nebeker when she "neither requested additional time nor communicated to Defendants she needed additional time to seek further medical help." Nebeker's failure to request an accommodation is fatal to her claim.

The federal regulations implementing the ADA describe an "informal, interactive process" through which the employer and employee "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171 (10th Cir. 1999) (en banc) (quoting 29 C.F.R. § 1630.2(*o*)(3)). "[B]efore an employer's duty to provide reasonable accommodations—or even to participate in the 'interactive process'—is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice." *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011). To request an accommodation, the employee may use plain English and does not need to specifically mention the ADA or use the phrase "reasonable accommodation." *Midland Brake*, 180 F.3d at 1172. Still, she must make her need for a "change in the work environment or in the way things are customarily done" known to her employer. *See* 29 C.F.R. § Pt. 1630, App. § 1630.2(*o*); *C.R. England*, 644 F.3d at 1049 (explaining that the employee must make clear that she wants assistance for her

12

disability). Thus, the employee has "the burden to request accommodation unless the employer has 'foreclosed the interactive process through its policies or explicit actions . . . .'" *Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 744 (10th Cir. 2013) (alteration in original) (quoting *Davoll v. Webb*, 194 F.3d 1116, 1133 (10th Cir. 1999)).

During Nebeker's deposition, she stated that the accommodations she wished Defendants would have made for her included emotional support and additional leave to get to the bottom of her health issues. A modified work schedule and leave for medical treatment may be a reasonable accommodation. *See* 42 U.S.C. § 12111(9) (including job restructuring and part-time or modified work schedules as potential reasonable accommodations); *Robert v. Bd. of Cnty. Comm'rs*, 691 F.3d 1211, 1217–18 (10th Cir. 2012) (listing a brief leave of absence for medical treatment or recovery as a potentially reasonable accommodation). But Nebeker never requested an accommodation.[5]

Instead, Nebeker asserts that she could not ask for additional time off because of Hansen's conduct toward her. In essence, she asserts Defendants foreclosed the interactive process before she could initiate it. *See Davoll*, 194 F.3d at 1133 ("Only in the rare case where an employer has essentially foreclosed the interactive process through

---

[5] Although Nebeker admitted to the district court during a hearing that she never requested an accommodation, she argues on appeal that she requested an accommodation during a meeting with Hansen when she said, "[M]y stress level has increased dramatically because these issues which, and with what I have gone through physically has obviously had a negative impact on me." Interpreting this statement as a request for a modified work schedule or additional leave is a leap the evidence cannot support.

13

its policies or explicit actions will the futile gesture doctrine apply."); *Albert v. Smith's Food & Drug Ctrs., Inc.*, 356 F.3d 1242, 1253 (10th Cir. 2004) ("Neither party may create or destroy liability by causing a breakdown of the interactive process."). Nebeker seems to be arguing for the futile gesture doctrine, which we have applied in the ADA context. In *Davoll*, the employer had an established policy against reassigning employees, even as an accommodation for an employee's disability. 194 F.3d at 1132. Because of the employer's policy, the district court instructed the jury that the plaintiffs bore the burden on their ADA discrimination claims of showing either that they requested to be reassigned or that, but for their knowledge of the no-reassignment policy, they would have asked to be reassigned. *Id.* at 1133. We cautioned, though, that "an employee's subjective belief about the futility of initiating the interactive process will not, by itself, relieve him or her of that obligation." *Id.*

Nebeker does not argue that Defendants had an established policy of refusing accommodations, but the evidence also does not show any explicit actions that *foreclosed* the interactive process. Nebeker has presented evidence that Hansen berated her and yelled at her, telling her, "You need to be here" time and again. But Hansen never refused Nebeker any requested leave and Nebeker never informed him that she needed more time than what she had already taken. Even when an employer is aware that an employee has significant health issues and frequently requests leave for medical appointments related to those issues, "[i]t is not the employer's responsibility to anticipate the employee's needs and affirmatively offer accommodation if the employer is otherwise open to such requests." *Koessel*, 717 F.3d at 745. We do not think Hansen

14

berating Nebeker about her absences shows that her request for an accommodation would have been futile. She wishes she would have had Hansen's support, yet she never explained to him that desire even apart from her need for additional leave. Further, Nebeker had at least one opportunity to speak freely with Hansen about her work concerns but failed to explain her need for support, a modified schedule, or medical leave. When Nebeker and Hansen met to discuss work concerns, Nebeker made only one passing reference to her health: "[M]y stress level has increased dramatically because these issues which, and with what I have gone through physically has obviously had a negative impact on me." And although the final meeting with Hansen was tense, he asked her, "What do you have to say?" in response to her absences. Instead of initiating an interactive process to explain her need for an accommodation, Nebeker ended the conversation and left Hansen's office. We conclude the futile gesture doctrine does not excuse Nebeker's failure to request an accommodation. We affirm the district court's conclusion that Nebeker received all the accommodations she requested and Defendants did not know of any need for further accommodation.

## VI. Discovery sanctions

Nebeker moved the district court to order sanctions against Defendants based on conduct during Kory Hansen's deposition. This conduct included Defendants' counsel ending the first deposition by walking out and explaining that it was over only "because I just said so," refusing to allow Kory to answer questions regarding the investigation of his business, and making, in Nebeker's view, numerous disruptive and inappropriate objections during the deposition. The district court never ruled on the motion and we

15

view such silence as an implicit denial of her request. *See Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1116 (10th Cir. 2004) (concluding that "the district court's failure to address [a party's] arguments may be properly construed as an implicit denial of those arguments"). We review for abuse of discretion when a district court implicitly rejects a party's discovery request or motion. *Miller v. Auto. Club of N.M., Inc.*, 420 F.3d 1098, 1118 (10th Cir. 2005), *overruled on other grounds by Burlington N. Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). "It is preferable that the district court set forth its reasons for denying a motion that calls for the exercise of its discretion," but "a failure of explanation is harmless when the record reveals the apparent reason or reasons justifying the denial." *Hill*, 393 F.3d at 1116.

We conclude the district court did not abuse its discretion in implicitly denying the motion for sanctions. The district court has discretion to impose appropriate sanctions when a person "impedes, delays, or frustrates the fair examination of the deponent," but the district court in no way is obligated to do so. Fed. R. Civ. P. 30(d)(2) ("The court *may* impose an appropriate sanction . . . ." (emphasis added)). Defendants explained that, because they did not dispute the State's investigation into Kory Hansen's business, Defendants' counsel did not anticipate questions regarding it. Although they temporarily suspended the deposition, they promptly rescheduled and completed it. Throughout the two sessions of the deposition, Defendants assert they made roughly 30 form objections to over 700 questions. Nearly half of these were based on "asked and answered," and the remaining were based on "lack of foundation" or "vague and ambiguous" questions. Nonetheless, Defendants' counsel allowed Kory to respond to pending questions. The

16

implicit denial of the motion for sanctions shows the district court did not consider Defendants' counsel's conduct to be so egregious as to warrant sanctions, and we see no reason to reverse.

## VII.  Conclusion

We affirm the district court's grant of summary judgment in Defendants' favor on Nebeker's three claims: (1) wrongful termination in violation of Utah public policy; (2) interference with her rights under the FMLA; and (3) discrimination under the ADA. We also affirm the district court's implicit denial of Nebeker's motion for sanctions.

Entered for the Court


Bobby R. Baldock
Circuit Judge